In the Matter of IRVING B. WEINSTEIN, Petitioner, against BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK, Respondent.

Third Department, November 10, 1943.

*Jonas & Ribman,* attorneys (*Benjamin C. Ribman* and *Horace M. Cohen* of counsel), for petitioner.

*Nathaniel L. Goldstein, Attorney-General (Orrin G. Judd, Solicitor-General; Herbert A. Einhorn, Assistant Attorney-General,* of counsel), for respondent.

HILL, P. J. This is a review under article 78 of the Civil Practice Act of a determination of the Board of Regents suspending petitioner's license to practice medicine for two years. He practiced at No. 1050 Herkimer St., Brooklyn. The proof relied upon to sustain the determination was given by Gertrude Datz, a special investigator of the Department of Education since June, 1932, who received five dollars a day when she

worked. She first called upon a Dr. Schlossman on Willoughby Avenue in Brooklyn on February 17, 1941, giving a fictitious name, Mrs. Ann Greenberg, and understating her age, also falsely saying that she was the mother of two children, the youngest eleven years of age. Her description of the approach which she made to Dr. Schlossman is: " I entered the office and he asked me what the trouble was and I told him I was overdue three weeks and was told if I came to him I would be — he would help me get rid of it. He asked who had recommended me to him, and I said one of my neighbors. He asked me the name, I told him I couldn't tell the name because it was one of my neighbor's sisters, I didn't know her name. He asked me when I menstruated last. I told him December 30, 1940."

She says that the doctor examined her heart and took her blood pressure which he stated was 190 and " entirely too high "; also that following a vaginal examination he told her that her womb " was tipped back " and that she had a small fibroid tumor. She asked if she was pregnant and the doctor said she was, and that it had advanced about seven weeks. He declined to perform an abortion but recommended petitioner, giving his street address which she wrote down. On the following day she with a Mrs. Kalish, an employee of the Police Department, called at petitioner's office. She describes being received first by a colored girl and then by the nurse, Mrs. Catherine Connelly, and upon entering an inner office met petitioner who gave her a cursory examination. She told him that Dr. Schlossman had said she was seven weeks pregnant, and that petitioner would abort her, and that " the fee would be $100. He said ' That's right '. He asked me how old my youngest child was and I told him eleven years." She was told to wait about a half hour and she returned to the room where Mrs. Kalish was waiting. She details various circumstances, including the arrival of a Dr. Gittelman and a conversation with Mrs. Connelly, the nurse. After she returned to the private office there was more discussion as to the fee, and the witness says: " I told him my friend had it in the waiting room in my purse, so he left the room. Then I heard Mrs. Connelly and Mrs. Kalish arguing about the fee. Dr. Weinstein came back and he said ' come on, get dressed. I don't like this. Get out. Why didn't you bring someone along with you who had some sense.' I put my clothes on and opened the door and admitted Mr. McCullough and the detectives and District Attorney." Mrs. Kalish testified that she went with Mrs. Datz, that Dr. Gittelman came to the office,

that there was an argument with Mrs. Connelly over giving her the money. She was not present in the private office and knew nothing of the transaction beyond what was told her by Mrs. Datz. No further evidence was introduced on behalf of the Department.

Dr. Schlossman's account of Mrs. Datz's call at his office varies from her testimony. He tells of the visit and the examination, finding that her blood pressure was " extremely high, about 190, over 100 ", the displacement of her womb and the small fibroid tumor. He noted upon a card that her failure to menstruate possibly might be the result of menopause. He was asked: " Q. Did the thought of having an abortion performed occur to you at all? A. No, sir, I knew it would be too dangerous — 190 blood pressure, fibroid in uterus, that is all marked down on my card." He further told her that she should consult a gynecologist, and he recommended petitioner with whom he had been acquainted since boyhood, and who had told him he was specializing in that branch of medicine.

The petitioner says that Dr. Schlossman telephoned him, and the following day Mrs. Datz and Mrs. Kalish called at his office. He made a preliminary examination, found extreme hypertension of the abdomen and the patient very nervous, so that he told her to get off the table for a time. He describes the termination of the visit: " About a minute or two later I came in and she had partially disrobed. As I walked into the room she said, ' Doctor, is this where you do the abortion? ' I said, ' My dear madam,' I said, ' who told you that I was going to do an abortion? ' She said, ' that is what I am here for.' I said to her, ' I will not do any abortion on you and, furthermore, I wish you would get dressed and step right out." She began to cry and said she wished her pocketbook which Mrs. Kalish had. Mrs. Connelly, the nurse, went to get it, while she was dressing Mrs. Kalish came into the room and urged that the doctor do something for Mrs. Datz who, taking the pocketbook said, " Here, doctor, I have a lot of money for you ".

The testimony given by the nurse is at variance with that given by Mrs. Datz, that at no time was there a discussion about an abortion in her presence, that she had no knowledge that such an act was contemplated; that during the period the doctor was examining Mrs. Datz, Dr. Gittelman was in the office. He had made some of petitioner's calls during the latter's vacation. The nurse, discussing petitioner's practice generally, said he had as many men as women patients.

This matter was presented in the criminal courts, first before a Magistrate who refused to hold that there were reasonable grounds to believe either Dr. Weinstein or Dr. Schlossman guilty, and later a Grand Jury failed to indict.

Upon the cross-examination of Dr. Weinstein it was brought out by the Attorney-General that in 1938 or 1939 he was under indictment for abortion and had submitted to an extortionate demand made by a Dr. Ditchik who received much publicity during what is commonly called the Amen investigation; that he had paid $1,300 to the extortioner who represented that he could prevent action by the Regents Grievance Committee. That indictment was dismissed August 5, 1940. The payment to Ditchik and the indictment there involved were not in any way connected with the Datz investigation. The petitioner was tried upon the indictment, the jury disagreed, following which the indictment was dismissed, and petitioner testified against Ditchik in the Amen investigation. The proof as to the transaction came out upon cross-examination by the Attorney-General and over the objection of petitioner's counsel. Further, over objection, petitioner said he was acquainted with a Dr. Blank who it is claimed was an abortioner. Concerning the relation, the Attorney-General asked: " As a matter of fact didn't you do abortions for him in his office? " An objection being overruled, petitioner answered " No sir ". He also said he had not referred cases to Dr. Blank for abortions.

Testimony given by a paid investigator is not of the highest character. In a divorce action it has been stated " that the evidence of detectives * * * which is adduced as the basis for the rendition of a judgment with such serious consequences, should receive some corroboration in order to command the judicial confidence. The rule of those cases, however, is not a rule of evidence, but one for the guidance of the judicial conscience." (*Winston* v. *Winston*, 165 N. Y. 553, 556.) This doctrine is cited with approval in *Yates* v. *Yates* (211 N. Y. 163, 171) and in *Schwartz* v. *Prudential Ins. Co.* (259 App. Div. 1052.) The latter case was brought to recover upon a disability policy of insurance.

Mrs. Datz's testimony as to the transaction with Dr. Schlossman is disputed by him in many important details. As the respondent deemed censure adequate punishment for his misconduct, a finding that he was a perjurer is not indicated. Likewise, the recitals as to transactions within the knowledge of the nurse, Mrs. Connelly, are disputed in many particulars by the latter. Much of the conversation with petitioner, testified to by Mrs. Datz, is disputed by him, and he is sustained

somewhat by the unquestioned fact that Dr. Gittelman was present in the office, and unless it is to be assumed that he would condone abortion, it is hardly reasonable that it would be undertaken almost in his presence.

A hearing of this kind is not criminal, but the punishment which may be administered is highly penal. The Attorney-General, on cross-examination, was permitted to question concerning other claimed abortions, a previous indictment and transactions with an abortioner. Much of this examination would not have been permitted in a criminal trial.

A jury refused to convict the petitioner of the earlier abortion charge, and the indictment was dismissed. A committing Magistrate, upon the proof presented on this review, refused to find probable cause to believe that petitioner was guilty, and a Grand Jury failed to indict.

Under subdivision 7 of section 1296 of the Civil Practice Act, it is the duty of this court to set aside a determination if it would set aside a similar finding by a jury as against the weight of evidence. With this history and the record as to what juries have done in connection with Dr. Weinstein's conduct, and for prejudicial errors in the receipt of evidence, the determination herein should be annulled and the matter remitted to respondent.

SCHENCK, J. (dissenting). I dissent. From the entire record there is substantial evidence to sustain the determination of the Board of Regents, and such determination should be affirmed.

CRAPSER and BLISS, JJ., concur with HILL, P. J.; SCHENCK, J., dissents with a memorandum in which HEFFERNAN, J., concurs.

Determination annulled, with fifty dollars costs, and matter remitted. [See *post*, p. 841.]