## BARSKY *v.* BOARD OF REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK.

No. 69.   Argued January 4, 1954.—Decided April 26, 1954.

*Abraham Fishbein* argued the cause and filed a brief for appellant.

*Henry S. Manley,* Assistant Attorney General of New York, argued the cause for appellee. With him on the brief were *Nathaniel L. Goldstein,* Attorney General, and *Wendell P. Brown,* Solicitor General.

MR. JUSTICE BURTON delivered the opinion of the Court.

The principal question here presented is whether the New York State Education Law,[1] on its face or as here construed and applied, violates the Constitution of the United States by authorizing the suspension from practice, for six months, of a physician because he has been convicted, in the United States District Court for the District of Columbia, of failing to produce, before a Committee of the United States House of Representatives, certain papers subpoenaed by that Committee.[2] For the reasons hereafter stated, we hold that it does not.

---

[1] McKinney's N. Y. Laws, Education Law, §§ 6514, 6515.

[2] The conviction was for violating R. S. § 102, as amended, 52 Stat. 942, 2 U. S. C. § 192:

"SEC. 102. Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House

444

In 1945, the Committee of the United States House of Representatives, known as the Committee on Un-American Activities, was authorized to make investigations of "the extent, character, and objects of un-American propaganda activities in the United States." [3]  In 1946, in the course of that investigation, the Committee subpoenaed Dr. Edward K. Barsky, appellant herein, who was then the national chairman and a member of the executive board of the Joint Anti-Fascist Refugee Committee, to produce "all books, ledgers, records and papers relating to the receipt and disbursement of money by or on account of the Joint Anti-Fascist Refugee Committee or any subsidiary or any subcommittee thereof, together with all correspondence and memoranda of communications by any means whatsoever with persons in foreign countries for the period from January 1, 1945, to March 29, 1946." [4]  Similar subpoenas were served on the executive secretary and the other members of the executive board of the Refugee Committee.  Appellant appeared before the Congressional Committee but, pursuant to advice of counsel and the action of his executive

---

of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

[3] "The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (1) the extent, character, and objects of un-American propaganda activities in the United States, (2) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle. of the form of government as guaranteed by our Constitution, and (3) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." 91 Cong. Rec. 10, 15.  This was carried into the Rules of the House as Rule XI (q) (2), 60 Stat. 823, 828.

[4] *United States* v. *Bryan,* 72 F. Supp. 58, 60.

board, he and the other officers of the Refugee Committee failed and refused to produce the subpoenaed papers.

In 1947, appellant, the executive secretary and several members of the executive board of the Refugee Committee were convicted by a jury, in the United States District Court for the District of Columbia, of violating R. S. § 102, as amended, 2 U. S. C. § 192, by failing to produce the subpoenaed papers. Appellant was sentenced to serve six months in jail and pay $500. See *United States* v. *Bryan,* 72 F. Supp. 58; *United States* v. *Barsky,* 72 F. Supp. 165. In 1948, this judgment was affirmed by the Court of Appeals, *Barsky* v. *United States,* 83 U. S. App. D. C. 127, 167 F. 2d 241, and certiorari was denied, 334 U. S. 843. In 1950, a rehearing was denied. Two Justices noted their dissents, and two did not participate. 339 U. S. 971. Appellant served his sentence, being actually confined five months.[5]

Appellant was a physician who practiced his profession in New York under a license issued in 1919. However, in 1948, following the affirmance of his above-mentioned conviction, charges were filed against him with the Department of Education of the State of New York by an inspector of that department. This was done under § 6515 of the Education Law, seeking disciplinary action pursuant to subdivision 2 (b) of § 6514 of that law:

> "2. The license or registration of a practitioner of medicine, osteopathy or physiotherapy may be revoked, suspended or annulled or such practitioner reprimanded or disciplined in accordance with the provisions and procedure of this article upon decision after due hearing in any of the following cases:
>
> .        .        .        .        .

---

[5] For related litigation, see *United States* v. *Bryan,* 339 U. S. 323; *United States* v. *Fleischman,* 339 U. S. 349; *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123.

"(b) That a physician, osteopath or physiotherapist has been convicted in a court of competent jurisdiction, either within or without this state, of a crime; or . . . ."

In 1951, after filing an amended answer, appellant was given an extended hearing before a subcommittee of the Department's Medical Committee on Grievances. The three doctors constituting the subcommittee made a written report of their findings, determination and recommendation, expressly taking into consideration the five months during which appellant had been separated from his practice while confined in jail, and also the testimony and letters submitted in support of his character. They recommended finding him guilty as charged and suspending him from practice for three months. The ten doctors constituting the full Grievance Committee unanimously found appellant guilty as charged. They also adopted the findings, determination and recommendation of their subcommittee, except that, by a vote of six to four, they fixed appellant's suspension at six months. Promptly thereafter, the Committee on Discipline of the Board of Regents of the University of the State of New York held a further hearing at which appellant appeared in person and by counsel. This committee consisted of two lawyers and one doctor. After reviewing the facts and issues, it filed a detailed report recommending that, while appellant was guilty as charged, his license be not suspended and that he merely be censured and reprimanded.[6] The Board of Regents, however, returned to and sustained the

---

[6] The committee said:

"Since violation of the Federal statute which Respondent has been convicted of violating involves inherently no moral turpitude, and since there has been no impeachment by evidence of Respondent's explanation (sufficient if unimpeached) of his failure to produce the subpoenaed documents, we find in the record no valid basis for discipline beyond the statutory minimum of censure and reprimand;

determination of the Medical Committee on Grievances, and suspended appellant's license for six months.[7]

Appellant sought a review of this determination, under § 6515 of the Education Law, *supra,* and Article 78 of the New York Civil Practice Act, Gilbert-Bliss' N. Y. Civ. Prac., Vol. 6B, 1944, §§ 1283–1306. The proceeding was instituted in the Supreme Court for the County of Albany and transferred to the Appellate Division, Third Department. That court confirmed the order of the Board of Regents. *In re Barsky,* 279 App. Div. 1117, 112 N. Y. S. 2d 778, and see 279 App. Div. 447, 111 N. Y. S. 2d 393, and 279 App. Div. 1101, 112 N. Y. S. 2d 780, 781. The Court of Appeals, with one judge dissenting, affirmed. 305 N. Y. 89, 111 N. E. 2d 222. That court allowed an appeal to this Court and amended its remittitur by adding the following:

> "Upon the appeals herein there were presented and necessarily passed upon questions under the Federal Constitution, viz., whether sections 6514 and 6515 of the Education Law, as construed and applied here,

_____

and we therefore recommend that Respondent's license be not suspended, as the Medical Committee on Grievances has recommended, but that he be censured and reprimanded."

[7] The order suspending appellant's license was issued by the Commissioner of Education in 1951, but its effect was stayed by the New York Court of Appeals, pending an appeal to this Court. 305 N. Y. 691, 112 N. E. 2d 773.

At about the same time, the board fixed at three months the suspension of the license of another doctor who was a member of the executive board of the Refugee Committee and who had been convicted with appellant. It also directed that a third doctor, who was a member of the same board, be censured and reprimanded. Each such determination was confirmed by the New York courts simultaneously with the confirmations relating to appellant. See 279 App. Div. 447, 111 N. Y. S. 2d 393; 279 App. Div. 1101, 112 N. Y. S. 2d 780, 781; 279 App. Div. 1117, 112 N. Y. S. 2d 778; and 305 N. Y. 89, 111 N. E. 2d 222.

are violative of the due process clause of the Fourteenth Amendment. The Court of Appeals held that the rights of the petitioners under the Fourteenth Amendment of the Constitution of the United States had not been violated or denied." 305 N. Y. 691, 112 N. E. 2d 773.

We noted probable jurisdiction, THE CHIEF JUSTICE not participating at that time. 346 U. S. 807, 801.

That appellant was convicted of a violation of R. S. § 102, as amended, 2 U. S. C. § 192, in a court of competent jurisdiction is settled. In the New York courts, appellant argued that a violation of that section of the federal statutes was not a crime under the law of New York and that, accordingly, it was not a "crime" within the meaning of § 6514–2 (b) of the New York Education Law. He argued that his conviction, therefore, did not afford the New York Board of Regents the required basis for suspending his license. That issue was settled adversely to him by the Court of Appeals of New York and that court's interpretation of the state statute is conclusive here.

He argues that § 6514–2 (b) is unconstitutionally vague. As interpreted by the New York courts, the provision is extremely broad in that it includes convictions for any crime in any court of competent jurisdiction within or without New York State. This may be stringent and harsh but it is not vague. The professional standard is clear. The discretion left to enforcing officers is not one of defining the offense. It is merely that of matching the measure of the discipline to the specific case.

A violation of R. S. § 102, as amended, 2 U. S. C. § 192, is expressly declared by Congress to be a misdemeanor. It is punishable by a fine of not more than $1,000 nor less than $100 and imprisonment for not less than one month nor more than twelve months. See note 2, *supra*.

For its violation appellant received a sentence of one-half the maximum and served five months in jail. There can be no doubt that appellant was convicted in a court of competent jurisdiction of a crime within the meaning of the New York statute.[8]

It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power. The state's discretion in that field extends naturally to the regulation of all professions concerned with health. In Title VIII of its Education Law, the State of New York regulates many fields of professional practice, including medicine, osteopathy, physiotherapy, dentistry, veterinary medicine, pharmacy, nursing, podiatry and optometry. New York has had long experience with the supervision of standards of medical practice by representatives of that profession exercising wide discretion as to the discipline to be applied. It has established detailed procedures for investigations, hearings and reviews with ample opportunity for the accused practitioner to have his case thoroughly considered and reviewed.

Section 6514, as a whole,[9] demonstrates the broad field of professional conduct supervised by the Medical Committee on Grievances of the Department of Education

---

[8] The subsequent designation of certain other contempts of Congress as federal "crimes" (18 U. S. C. § 402) does not prevent this misdemeanor from being a crime within the meaning of the New York statute.

[9] "§ 6514. Revocation of certificates; annulment of registrations

"1. Whenever any practitioner of medicine, osteopathy or physiotherapy shall be convicted of a felony, as defined in section sixty-five hundred two of this article, the registration of the person so convicted may be annulled and his license revoked by the department. It shall be the duty of the clerk of the court wherein such conviction takes place to transmit a certificate of such conviction to the department. Upon reversal of such judgment by a court having jurisdic-

and the Board of Regents of the University of the State of New York. In the present instance, the violation of § 6514–2 (b) is obvious. The real problem for the state agencies is that of the appropriate disciplinary action to be applied.

tion, the department, upon receipt of a certified copy of such judgment or order of reversal, shall vacate its order of revocation or annulment.

"2. The license or registration of a practitioner of medicine, osteopathy or physiotherapy may be revoked, suspended or annulled or such practitioner reprimanded or disciplined in accordance with the provisions and procedure of this article upon decision after due hearing in any of the following cases:

"(a) That a physician, osteopath or physiotherapist is guilty of fraud or deceit in the practice of medicine, osteopathy or physiotherapy or in his admission to the practice of medicine, osteopathy or physiotherapy; or

"(b) That a physician, osteopath or physiotherapist has been convicted in a court of competent jurisdiction, either within or without this state, of a crime; or

"(c) That a physician, osteopath or physiotherapist is an habitual drunkard, or is or has been addicted to the use of morphine, cocaine or other drugs having similar effect, or has become insane; or

"(d) That a physician, osteopath or physiotherapist offered, undertook or agreed to cure or treat disease by a secret method, procedure, treatment or medicine or that he can treat, operate and prescribe for any human condition by a method, means or procedure which he refuses to divulge upon demand to the committee on grievances; or that he has advertised for patronage by means of handbills, posters, circulars, letters, stereopticon slides, motion pictures, radio, or magazines; or

"(e) That a physician, osteopath or physiotherapist did undertake or engage in any manner or by any ways or means whatsoever to perform any criminal abortion or to procure the performance of the same by another or to violate section eleven hundred forty-two of the penal law, or did give information as to where or by whom such a criminal abortion might be performed or procured.

"(f) That a physician, osteopath or physiotherapist has directly or indirectly requested, received or participated in the division, transference, assignment, rebate, splitting or refunding of a fee for, or has directly or indirectly requested, received or profited by means of a credit or other valuable consideration as a commission, discount

The practice of medicine in New York is lawfully prohibited by the State except upon the conditions it imposes. Such practice is a privilege granted by the State under its substantially plenary power to fix the terms of admission. The issue is not before us but it has not been questioned that the State could make it a condition of admission to practice that applicants shall not have been convicted of a crime in a court of competent jurisdiction either within or without the State of New York. It could at least require a disclosure of such convictions as a condition of admission and leave it to a competent board to determine, after opportunity for a fair hearing, whether the convictions, if any, were of such a date and nature as to justify denial of admission to practice in the light of all material circumstances before the board.

It is equally clear that a state's legitimate concern for maintaining high standards of professional conduct extends beyond initial licensing. Without continuing supervision, initial examinations afford little protection. Appellant contends, however, that the standard which New York has adopted exceeds reasonable supervision and deprives him of property rights in his license and

or gratuity in connection with the furnishing of medical, surgical or dental care, diagnosis or treatment or service, including x-ray examination and treatment, or for or in connection with the sale, rental, supplying or furnishing of clinical laboratory services or supplies, x-ray laboratory services or supplies, inhalation therapy service or equipment, ambulance service, hospital or medical supplies, physiotherapy or other therapeutic service or equipment, artificial limbs, teeth or eyes, orthopedic or surgical appliances or supplies, optical appliances, supplies or equipment, devices for aid of hearing, drugs, medication or medical supplies or any other goods, services or supplies prescribed for medical diagnosis, care or treatment under this chapter, except payment, not to exceed thirty-three and one-third per centum of any fee received for x-ray examination, diagnosis or treatment, to any hospital furnishing facilities for such examination, diagnosis or treatment. . . ."

his established practice, without due process of law in violation of the Fourteenth Amendment.

He argues that New York's suspension of his license because of his conviction in a foreign jurisdiction, for an offense not involving moral turpitude [10] and not criminal under the law of New York, so far transcends that State's legitimate concern in professional standards as to violate the Fourteenth Amendment. We disagree and hold that New York's governmental discretion is not so restricted.

This statute is readily distinguishable from one which would require the automatic termination of a professional license because of some criminal conviction of its holder.[11] Realizing the importance of high standards of character and law observance on the part of practicing physicians, the State has adopted a flexible procedure to protect the public against the practice of medicine by those convicted of many more kinds and degrees of crime than it can well list specifically. It accordingly has sought to attain its justifiable end by making the conviction of any crime a violation of its professional medical standards, and then leaving it to a qualified board of doctors to determine initially the measure of discipline to be applied to the offending practitioner.

Section 6515 of the New York Education Law thus meets the charge of unreasonableness. All charges are passed upon by a Committee on Grievances of the department. That committee consists of ten licensed physicians, appointed by the Board of Regents. The term of each member is five years. They serve without compensation. Three are "members of conspicuous profes-

---

[10] See *Sinclair* v. *United States,* 279 U. S. 263, 299.

[11] A conviction for a crime which, under the law of New York, would amount to a felony has been given such an automatic effect in some instances. See McKinney's N. Y. Laws, Education Law, § 6613–12, as to dentists; and McKinney's N. Y. Laws, Judiciary Law, § 90–4, as to attorneys. Cf. § 6514–1, note 9, *supra,* as to physicians. See *In re Raab,* 156 Ohio St. 158, 101 N. E. 2d 294.

sional standing" appointed upon the board's own nomination. § 6515–2. The others are appointed from lists of nominees submitted respectively by the New York State Medical, Homeopathic and Osteopathic Societies. Charges must be filed in writing and a subcommittee of three or more members hears and reports on them. At least ten days' notice of a hearing is required and opportunity is afforded the accused to appear personally, or by counsel, with the right to produce witnesses and evidence on his own behalf, to cross-examine witnesses, to examine evidence produced against him and to have subpoenas issued by the committee. The subcommittee transmits its report, findings and recommendation, together with a transcript of evidence, to the Committee on Grievances. That committee may take further testimony. It determines the merit of the charges and, if the practitioner is found guilty by a unanimous verdict, the record, together with the findings and determination of the committee, is transmitted to the Board of Regents. That board, "after due hearing," may accept or modify the committee's recommendation, or find the practitioner not guilty and dismiss the charges. § 6515–7. "The committee on grievances shall not be bound by the laws of evidence in the conduct of its proceedings, but the determination shall be founded upon sufficient legal evidence to sustain the same." § 6515–5. If the accused is found guilty, he may institute proceedings for review under Article 78 of the Civil Practice Act, returnable before the Appellate Division of the Third Judicial Department.

The above provisions, on their face, are well within the degree of reasonableness required to constitute due process of law in a field so permeated with public responsibility as that of health.

The statutory procedure as above outlined has been meticulously followed in this case and no objection is

made on that score. Appellant, nevertheless, complains that, as construed and applied by the Medical Committee on Grievances and its subcommittee, his hearing violated the due process of law required by the Fourteenth Amendment. He contends that evidence was introduced which was immaterial and prejudicial and that the committee based its determination upon that evidence. He contends, in effect, that the committee reached its determination without "sufficient legal evidence to sustain the same," thus exceeding its statutory authority. He claims further that the committee acted capriciously and arbitrarily upon immaterial and prejudicial evidence, thus not only exceeding its statutory authority but depriving him of his property without due process of law.

The state courts have determined that the hearing did not violate the statute and, accordingly, we are concerned only with the constitutional question. The claim is that immaterial and prejudicial evidence of the alleged subversive activities of the Refugee Committee was introduced and relied upon. Emphasis is given to evidence that the Refugee Committee had been placed on the Attorney General's list of subversive or Communistic organizations. To emphasize the prejudicial character of this testimony, appellant refers to the fact that, at the time of the subcommittee hearing, litigation involving such list was pending in the courts and had resulted in a decision adverse to appellant, whereas that decision subsequently was set aside by this Court.[12] The State's answer to these claims is that such testimony was invited by appellant's own testimony as to the activities of the Refugee Committee.[13] The State shows also that while such evidence was not necessary to establish appellant's

---

[12] *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123.

[13] The character of the activities of the Joint Anti-Fascist Refugee Committee was placed in issue by appellant's amended answer. He volunteered much testimony as to the benevolent and charitable pro-

violation of the federal statute as to the subpoenaed papers, it was material and admissible to assist the Committee on Grievances and the other agencies in determining the appropriate disciplinary measures to be applied to appellant under the state law. Appellant recognized this materiality by endeavoring to use evidence as to the Refugee Committee's charitable activities to justify and excuse his failure to produce the subpoenaed papers.

We find nothing sufficient to sustain a conclusion that the Board of Regents or the recommending committees made an arbitrary or capricious decision or relied upon irrelevant evidence. The report made by the original subcommittee of three that heard the evidence indicates that it was not influenced by the character of the Refugee Committee. It said:

> "We do not feel that we are now concerned, nor would we be able to determine, whether the books and records of that Committee would disclose whether the Committee was completely philanthropic in character, or whether it was engaged in subversive activities."

The painstaking complete review of the evidence and the issues by the Committee on Discipline of the Board of Regents demonstrates a high degree of unbiased objectivity. Before the final action of the Board of Regents, the Committee on Discipline in its report to that board noted that—

> "After the hearing below and the determination of the Medical Committee on Grievances, the Supreme Court of the United States reversed an order of the District Court dismissing a complaint by the Refugee Committee in an action by it for declaratory and

---

grams in which the committee participated and he introduced many exhibits on the same subject. Reference to the Attorney General's list of subversives developed naturally during the resulting cross-examination of appellant.

injunctive relief (*Joint Anti-Fascist Refugee Committee* v. *McGrath, Attorney General,* 341 U. S. 123), some of the majority justices going on the ground that a determination of this kind could not constitutionally be made without a hearing and opportunity to offer proof and disproof. In view of this decision, no evidentiary weight can be given in the present proceeding to the listing by the Attorney General."

That committee thus recognized the existence of a valid basis for disciplinary action but found "no valid basis for discipline beyond the statutory minimum of censure and reprimand." With this recommendation before the Board of Regents, we see no reason to conclude that the board disregarded it or acted arbitrarily, capriciously or through prejudice and deprived appellant of due process of law. The board made no specific findings. It accepted and sustained the unanimous determination of the Medical Committee on Grievances, which was that appellant was guilty. Then, in compliance with the recommendation of that committee, it fixed the measure of discipline at a six months' suspension of appellant's registration as a physician.

The Court has considered the other points raised by appellant but finds no substantial federal constitutional objection in them, even assuming that they are before us as having been considered by the Court of Appeals, although not mentioned in its opinion or the amendment to its remittitur.

The judgment of the Court of Appeals of the State of New York, accordingly, is

*Affirmed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

Dr. Barsky has been a practicing physician and surgeon since his graduation from the medical college of Columbia

University in 1919, except for time spent doing postgraduate work in Europe.   Beginning with his internship he has been almost continuously on the staff of Beth Israel Hospital in New York, the city of his birth.   During the Spanish Civil War Dr. Barsky and others became actively concerned with the medical needs of Loyalist soldiers. The doctor went over to Spain to head an American hospital for the Loyalist wounded.   Following his return to practice in New York Dr. Barsky became chairman of the Joint Anti-Fascist Refugee Committee, an organization founded in 1942 to help with problems of Spanish refugees from the Franco government.   In 1945 the House Committee on Un-American Activities began an investigation of the Refugee Committee to see if it was spreading political propaganda.   Dr. Barsky and other members of the organization's executive board were summoned before the congressional Committee and asked to produce the records of contributions and disbursements of the Refugee Committee.   Dr. Barsky and the others refused, explaining that many contributors had relatives in Spain whose lives might be endangered if the contributors' names were given out publicly.   Instead, the organization was willing to give the required information to the President's War Relief Control Board.   In making his refusal, Dr. Barsky had the advice of attorneys that his action was justified because the congressional Committee's subpoena transcended its constitutional powers.   Concededly this advice was reasonable and in accord with the legal opinion of many lawyers and jurists throughout the country.[1]   Moreover, the Refugee Committee was advised that the only way to raise its constitutional claim and test the

---

[1] And certainly since our recent holding in ˙United States v. Rumely, 345 U. S. 41, it cannot be said that it is "fanciful or factitious" to claim that the First Amendment bars congressional committees from seeking the names of contributors to an organization alleged to be engaged in "political propaganda."

subpoena's validity was for its executives to risk jail by refusing to produce the requested papers. Dr. Barsky was sentenced to six months in jail as punishment for his disobedience of the order to produce, and the Court of Appeals affirmed his sentence, overruling his constitutional arguments. This Court denied certiorari without approving or disapproving the constitutional contentions. 334 U. S. 843.

When Dr. Barsky was released from jail and ready to resume his practice, an agent of the Board of Regents of the University of the State of New York [2] served him with a complaint demanding that his license to practice medicine be revoked. This action was not based on any alleged failing of Dr. Barsky in his abilities or conduct as a physician or surgeon. The sole allegation was that he had been convicted of a crime—refusal to produce papers before Congress. New York law authorizes revocation or suspension of a physician's license if he is convicted of a crime. Hearings were held before a Grievance Committee of physicians appointed by the Regents, and there was much testimony to the effect that Dr. Barsky was both a skillful surgeon and a good citizen. No witness testified to any conduct of Dr. Barsky which in any way reflected on his personal or professional character. Nothing was proven against him except that he had refused to produce papers. In reviewing the findings of fact, pursuant to § 211 of the State's Education Law, the Regents' Discipline Committee reported that Dr. Barsky's refusal to produce the Refugee Committee's papers was shown to be due to a desire to preserve the constitutional rights of his organization, that his offense involved no

[2] The University of the State of New York is the historic name of the corporate body which the Regents make up. It has no faculty or students of its own. See McKinney's N. Y. Laws, Education Law, § 201 et seq.

moral turpitude whatever,[3] and that he had already been punished. The right to test the constitutional power of a Committee is itself a constitutionally protected right in this country.[4] But despite all these things the Regents suspended Dr. Barsky's medical license for six months, giving no reason for their action.

I have no doubt that New York has broad power to regulate the practice of medicine. But the right to practice is, as MR. JUSTICE DOUGLAS shows, a very precious part of the liberty of an individual physician or surgeon. It may mean more than any property. Such a right is protected from arbitrary infringement by our Constitution, which forbids any state to deprive a person of liberty or property without due process of law. Accordingly, we brought this case here to determine if New York's action against Dr. Barsky violates the requirements of the Federal Constitution.

This record reveals, in my opinion, that New York has contravened the Constitution in at least one, and possibly two respects. First, it has used in place of probative evidence against Dr. Barsky an attainder published by the Attorney General of the United States in violation of the Constitution. Second, it has permitted Dr. Barsky to be tried by an agency vested with intermingled legislative-executive-judicial powers so broad and so devoid of legislative standards or guides that it is in effect not a tribunal operating within the ordinary safeguards of law but an agency with arbitrary power to decide, conceivably on the basis of suspicion, whim or caprice, whether or not physicians shall lose their licenses.

_____

[3] This Court has authoritatively construed the federal offense of refusing to comply with a congressional subpoena as involving no moral turpitude. *Sinclair* v. *United States,* 279 U. S. 263, 299.

[4] See *Ex parte Young,* 209 U. S. 123, 148, and *Oklahoma Operating Co.* v. *Love,* 252 U. S. 331, 335–338.

*First.* At the hearing before a subcommittee of the Medical Grievance Committee, appointed by the Regents, the lawyer for the Regents introduced evidence that the Refugee Committee headed by Dr. Barsky had been listed by the Attorney General of the United States as subversive. Pages and pages of the record are devoted to this listing, to arguments about its meaning and to other innuendoes of suspected Communistic associations of Dr. Barsky without a single word of legal or credible proof. Excerpts from the record are printed in the Appendix to this opinion. The Grievance Committee made a formal finding of fact that the Refugee Committee had been listed as subversive. This Court, however, has held that the Attorney General's list was unlawful, *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123. My view was and is that the list was the equivalent of a bill of attainder which the Constitution expressly forbids. The Regents' own reviewing Committee on Discipline recognized the illegality of the list and advised the Regents that no weight should be given to it. This reviewing committee also recommended that the Regents not accept the Grievance Committee's recommendation of a six months' suspension but instead give no suspension at all. The Regents, however, accepted and sustained the determination of the Grievance Committee. Dr. Barsky sought review in the Court of Appeals, but New York's highest court said it was without power to review the use of the Attorney General's list. Our responsibility is, however, broader. We must protect those who come before us from unconstitutional deprivation of their rights, whether the state court is empowered to do so or not. The record shows that the Grievance Committee made a finding of fact that "Ever since 1947, the [Refugee] Committee has been listed as subversive by the Attorney General of the United

States." It seems perfectly natural for the Grievance Committee to rely on this list, for the Regents are charged with the duty of making up their own list of "subversive" organizations for the purpose of dismissing teachers, and New York law authorizes the Regents to make use of the Attorney General's list.[5] Dr. Barsky had a constitutional right to be free of any imputations on account of this illegal list. That reason alone should in my judgment require reversal of this case.

*Second.* Even if the evidence considered by the Regents and the Grievance Committee had been proper, I would still have grave doubts that Dr. Barsky was tried by procedures meeting constitutional requirements. The Regents who tried and suspended him exercise executive, legislative and judicial powers.[6] The Regents have broad supervisory and disciplinary controls over schools, school boards and teachers. They also have powers over libraries and library books, and they censor movies.[7] Doctors, dentists, veterinarians. accountants,

---

[5] Education Law, § 3022. See *Adler* v. *Board of Education of the City of New York,* 342 U. S. 485.

[6] The New York Constitution, Art. V, § 4, makes the Regents head of the Department of Education with power to appoint and remove at pleasure a Commissioner of Education who is the Department's chief administrative officer. These nonsalaried Regents are almost entirely independent of the Governor, being elected on joint ballot of the two houses of the Legislature for thirteen-year terms. Education Law, § 202. Executive power over the State's educational system is vested in the Regents by § 101 of the Education Law. Section 207 provides that "the regents shall exercise legislative functions concerning the educational system of the state, determine its educational policies, and, except, as to the judicial functions of the commissioner of education, establish rules for carrying into effect the laws and policies of the state . . . ."

[7] See Education Law, §§ 120 *et seq.,* 214, 215, 216, 219, 224, 245 *et seq.,* 704, 801 *et seq.* On motion picture censorship by the Regents see *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495.

surveyors, and other occupational groups are also subject to discipline by the Regents and must obey their rules.[8] For example the Department of Education, headed by the Regents, has its own investigators, detectives and lawyers to get evidence and develop cases against doctors.[9] Persons appointed by the Department prefer charges and testify against an accused before a committee of doctors appointed by the Regents. This committee after hearing evidence presented by departmental prosecutors makes findings and recommendations which are reviewed by another Regents' committee with power to make its own findings and recommendations. Then the Regents themselves, apparently bound in no way by the recommendations of either of their committees, make the final decision as to doctors' professional fate.

A doctor is subject to discipline by the Regents whenever he is convicted of a "crime" within or without the State. Whether his "crime" is the most debasing or the most trivial, the Regents have complete discretion to impose any measure of discipline from mere reprimand to full revocation of the doctor's license.[10] No legislative standards fetter the Regents in this respect. And no court in New York can review the exercise of their "discretion," if it is shown that the Regents had authority to

---

[8] Education Law, §§ 211, 6501–7506. The professions of pharmacy, optometry, podiatry, nursing, shorthand reporting, architecture and engineering are also under the Regents' jurisdiction.

[9] For examples of entrapment of doctors by the Regents' investigators and the narrowness of judicial review afforded accused doctors see *Weinstein* v. *Board of Regents,* 267 App. Div. 4, 44 N. Y. S. 2d 917, reversed, 292 N. Y. 682, 56 N. E. 2d 104; *Epstein* v. *Board of Regents,* 267 App. Div. 27, 44 N. Y. S. 2d 921, reversed, 295 N. Y. 154, 65 N. E. 2d 756.

[10] *Barsky* v. *Board of Regents,* 305 N. Y. 89, 99, 111 N. E. 2d 222, 226.

impose any discipline at all.[11]   Should they see fit to let a doctor repeatedly guilty of selling narcotics to his patients continue to practice, they could do so and at the same time bar for life a doctor guilty of a single minor infraction having no bearing whatever on his moral or professional character.   They need give no reasons.   Indeed the Regents might discipline a doctor for wholly indefensible reasons, such as his race, religion or suspected political beliefs, without any effective checks on their decisions.

In this case one can only guess why the Regents overruled their Discipline Committee and suspended Dr. Barsky.   Of course it may be possible that the Regents thought that *every* doctor who refuses to testify before a congressional committee should be suspended from practice.[12]   But so far as we know the suspension may rest on the Board's unproven suspicions that Dr. Barsky had associated with Communists.   This latter ground, if the basis of the Regents' action, would indicate that in New York a doctor's right to practice rests on no more than the will of the Regents.   This Court, however, said many years ago that "the nature and the theory of our institutions of government . . . do not mean to leave room for the play and action of purely personal and arbitrary power. . . .   For, the very idea that one man may be compelled to hold his life, or the means of living, or

---

[11] The Regents, with their many law-enforcement duties, are plainly not a judicial body in the ordinary sense, yet court review is virtually precluded.   Whether due process of law can be satisfied in this type of case by procedures from which effective review by the regular judicial branch of the government is barred is certainly not wholly clear.   Compare *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287, *Ng Fung Ho* v. *White,* 259 U. S. 276 and *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, with *Yakus* v. *United States,* 321 U. S. 414.

[12] But see note 7 of the Court's opinion.

any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails . . . ." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369–370.[13]

APPENDIX TO OPINION OF MR. JUSTICE BLACK.

At the hearing before the Subcommittee of the Medical Grievance Committee there was a great deal of testimony as to the nature and purposes of the Joint Anti-Fascist Refugee Committee. Mr. Tartikoff, Assistant Attorney General of New York, representing the Department of Education, repeatedly attempted to show that the Committee had engaged in "subversive" or "Un-American"

---

[13] See *Davis* v. *Schnell,* 81 F. Supp. 872, where in an opinion by Mullins, D. J., a three-judge district court, following *Yick Wo* v. *Hopkins,* struck down a state constitutional provision limiting voters to those who could "understand and explain" the Constitution. County Boards of Registrars were by statute given discretion to determine whether persons seeking to vote had satisfied the constitutional provision. Judge Mullins said:

"The words 'understand and explain' do not provide a reasonable standard. A simple test may be given one applicant; a long, tedious, complex one to another; one applicant may be examined on one article of the Constitution; another may be called upon to 'understand and explain' every article and provision of the entire instrument.

"To state it plainly, the sole test is: Has the applicant by oral examination or otherwise understood and explained the Constitution to the satisfaction of the particular board? To state it more plainly, the board has a right to reject one applicant and accept another, depending solely upon whether it likes or dislikes the understanding and explanation offered. To state it even more plainly, the board, by the use of the words 'understand and explain,' is given the arbitrary power to accept or reject any prospective elector that may apply . . . . Such arbitrary power amounts to a denial of equal protection of the law within the meaning of the Fourteenth Amendment . . . ." 81 F. Supp., at 878. This Court affirmed without writing an opinion of its own: 336 U. S. 933.

activities. However, he presented no probative evidence tending to prove this allegation. Finally, Mr. Tartikoff sought to bring out that the Committee had been listed by the Attorney General of the United States as "subversive." Excerpts from the record of his questioning of Dr. Barsky on this point are quoted below.

"MR. TARTIKOFF: resuming—

"Q. Doctor, is it not a fact that on or about November 24, 1947, the Attorney General of the United States, in pursuance of a directive contained in an executive order of the President of the United States listed and published a classification of organizations deemed to be subversive and Un-American, and that included amongst those organizations at that time by the Attorney General deemed to be subversive and Un-American was the Joint Anti-Fascist Refugee Committee?"

At this point Mr. Fishbein, Dr. Barsky's attorney, objected to the question. After a brief colloquy between counsel the record continues:

"MR. TARTIKOFF: I think this committee is entitled to know whether this organization is listed by the Attorney General of the United States as being subversive and Un-American, particularly in light of Dr. Barsky's testimony that the activity of the organization since its inception in 1942 down to and including all through 1950 has been substantially the same during that period of time."

After further discussion:

"MR. TARTIKOFF: You have introduced document after document to show this is one of the finest organizations in the world. I think I am entitled to counter that with evidence that the Attorney General of the United States reviewed the activities

of this organization in whatever fashion he is supposed to review it and has come to an opposite conclusion."

Shortly after, Dr. Shearer, the subcommittee chairman, overruled Mr. Fishbein's objection, and the hearing proceeded as follows:

"MR. TARTIKOFF: resuming—

"Q. Was it so listed, Dr. Barsky?

"A. Mr. Tartikoff, the attorney—

"Q. Question: Was it so listed? That can take a 'yes' or 'no' answer.

"A. I just would like to bring up—

"MR. TARTIKOFF:

"I ask the committee to direct him to answer that question 'yes' or 'no.'

"CHAIRMAN SHEARER: 'Yes' or 'no,' Doctor Barsky.

"A. If I may for a moment,—off the record—

"Q. Doctor, will you please answer the question?

"A. The answer to the question is 'yes.'

"Q. And was it not again so listed by the Attorney General of the United States in a release made on May 27, 1948?

"A. The answer is I really don't know. You have the statement.

"Q. If I tell you that the statement so indicates, would you dispute it?

"A. I certainly would not, Mr. Tartikoff.

"Q. And isn't it a fact that it was again so listed on April 21, 1949, July 20, 1949, September 26, 1949, August 24, 1950, and September 5, 1950?

"A. I think you brought out the same list, Mr. Tartikoff.

"Q. Well, there may have been additional ones added, for your information.

"A. I really don't remember.

"Q. And doctor, didn't you as chairman of the Joint Anti-Fascist Refugee bring a proceeding against the Attorney General in the United States courts?

"A. Yes, sir.

"Q. To restrain him from listing your organization as subversive?

"A. Yes, sir.

"Q. And isn't it a fact that the Circuit Court ruled against you on that on August 11, 1949?

"A. Yes, sir."

Later, after Dr. Barsky had asked the subcommittee not to "lay too much stress on the fact that this list was made," Mr. Tartikoff asked him these questions:

"Q. Wasn't there also an investigation in California by a Committee on Un-American Activities?

"A. The House Committee?

"Q. The Legislative Committee in California. A Legislative Committee of the State of California, and didn't they likewise list your organization as Communistic?

"A. What do you mean?

"Q. The California Committee on Un-American Activities, that's the Tenney Committee, did they list your organization as Communistic?

"A. I really don't know. If you have the record—"

MR. JUSTICE FRANKFURTER, dissenting.

While in substantial agreement with what is said in the Court's opinion, I am constrained to dissent because of what is left unsaid.

Appellant's suspension from the practice of medicine grew out of his conviction for refusing to turn over to the House Un-American Activities Committee documents of the Joint Anti-Fascist Refugee Committee, an organization of which appellant was Chairman. The Medical Subcommittee on Grievances of the New York Board of Regents, which held the original hearing in the disciplinary proceeding now before us, allowed counsel for the Regents to introduce evidence that this Joint Anti-Fascist Refugee Committee was in 1947 listed by the Attorney General of the United States as a subversive organization, and the Subcommittee accordingly made a specific finding to this effect in its report. This evidence was obviously irrelevant to the issue before the Committee—whether appellant had been convicted of a crime—and was also obviously extremely prejudicial to appellant. The Regents' Committee on Discipline, reviewing the Grievance Committee, commented as follows on this matter:

"There is, it should be noted, evidence in the record, and reliance on that evidence in the findings of the Medical Committee on Grievances, that the Refugee Committee had been listed as Communist in the list furnished by the Attorney General of the United States . . . . In view of [the decision in *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123], no evidentiary weight can be given in the present proceeding to the listing by the Attorney General."

The Committee on Discipline concluded that appellant should not be suspended for six months, as the Grievance Committee had recommended, but should only be reprimanded. In face of this recommendation, the Board of Regents, without stating any reasons, accepted the deci-

sion of the Grievance Committee and ordered appellant suspended for a period of six months from his right to practice medicine.

When this question came before the New York Court of Appeals, that Court disposed of the issue as follows:

"As to the assertions, by appellants . . . that the Regents, in deciding on punishment, ignored weighty. considerations and acted on matters not proper for consideration, it is enough to say that we are wholly without jurisdiction to review such questions . . . ." 305 N. Y. 89, 99, 111 N. E. 2d 222, 226.

Thus the highest court of the State of New York tells us, in effect, "Yes, it may be that the Regents arbitrarily deprived a doctor of his license to practice medicine, but the courts of New York can do nothing about it." Such a rule of law, by denying all relief from arbitrary action, implicitly sanctions it; and deprivation of interests that are part of a man's liberty and property, when based on such arbitrary grounds, contravenes the Due Process Clause of the Fourteenth Amendment.

Of course a State must have the widest leeway in dealing with an interest so basic to its well-being as the health of its people. This includes the setting of standards, no matter how high, for medical practitioners, and the laying down of procedures for enforcement, no matter how strict. The granting of licenses to practice medicine and the curtailment or revocation of such licenses may naturally be entrusted to the sound discretion of an administrative agency. And while ordinary considerations of fairness and good sense may make it desirable for a State to require that the revocation or temporary suspension of a medical license be justified by stated reasons, the Due Process Clause of the Fourteenth Amendment does not lay upon the States the duty

of explaining presumably conscientious action by appropriate State authorities. *Douglas* v. *Noble,* 261 U. S. 165, 169–170. Reliance on the good faith of a State agency entrusted with the enforcement of appropriate standards for the practice of medicine is not in itself an investiture of arbitrary power offensive to due process. Likewise there is nothing in the United States Constitution which requires a State to provide for judicial review of the action of such agencies. Finally, when a State does establish some sort of judicial review, it can certainly provide that there be no review of an agency's discretion, so long as that discretion was exercised within the gamut of choices, however extensive, relevant to the purpose of the power given the administrative agency. So far as concerns the power to grant or revoke a medical license, that means that the exercise of the authority must have some rational relation to the qualifications required of a practitioner in that profession.

It is one thing thus to recognize the freedom which the Constitution wisely leaves to the States in regulating the professions. It is quite another thing, however, to sanction a State's deprivation or partial destruction of a man's professional life on grounds having no possible relation to fitness, intellectual or moral, to pursue his profession. Implicit in the grant of discretion to a State's medical board is the qualification that it must not exercise its supervisory powers on arbitrary, whimsical or irrational considerations. A license cannot be revoked because a man is redheaded or because he was divorced, except for a calling, if such there be, for which redheadedness or an unbroken marriage may have some rational bearing. If a State licensing agency lays bare its arbitrary action, or if the State law explicitly allows it to act arbitrarily, that is precisely the kind of State action which the Due Process Clause forbids. See *Per-*

*kins* v. *Elg,* 307 U. S. 325, 349–350; also *Rex* v. *Northumberland Compensation Appeal Tribunal,* [1951] 1 K. B. 711. The limitation against arbitrary action restricts the power of a State "no matter by what organ it acts." *Missouri* v. *Dockery,* 191 U. S. 165, 171.

If the Regents had explicitly stated that they suspended appellant's license or lengthened the time of the suspension because he was a member of an organization on the so-called Attorney General's list, and the New York Court of Appeals had declared that New York law allows such action, it is not too much to believe that this Court would have felt compelled to hold that the Due Process Clause disallows it. See *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 104 F. Supp. 567. Yet that is precisely what we may have here. It bears repeating that the Court of Appeals, the ultimate voice of New York law, found itself impotent to give relief on appellant's claim that the Regents "in deciding on punishment, ignored weighty considerations and acted on matters not proper for consideration." 305 N. Y. 89, 99, 111 N. E. 2d 222, 226. At the very least, for all that appears, the Court of Appeals assumed that the Regents relied "on matters not proper for consideration." Thus the appellant may have been deprived of the liberty to practice his profession and of his property interests in his profession in contravention of due process. This is not a merely abstract possibility. The "punishment"—the Court of Appeals so characterized it—recommended by the Grievance Committee rested certainly in part on arbitrary considerations, and the Board of Regents appears to have adopted this tainted "determination." Since the decision below may rest on a constitutionally inadmissible ground, the judgment should not stand. *Stromberg* v. *California,*

283 U. S. 359, 368; *Williams* v. *North Carolina,* 317 U. S. 287, 292.

I would return this case to the New York authorities for reconsideration in light of the views here expressed.

Mr. Justice Douglas, with whom Mr. Justice Black concurs, dissenting.

Mr. Justice Holmes, while a member of the Supreme Judicial Court of Massachusetts, coined a dictum that has pernicious implications. "The petitioner may have a constitutional right to talk politics," he said, "but he has no constitutional right to be a policeman." See *McAuliffe* v. *New Bedford,* 155 Mass. 216, 220, 29 N. E. 517. By the same reasoning a man has no constitutional right to teach, to work in a filling station, to be a grocery clerk, to mine coal, to tend a furnace, or to be on the assembly line. By that reasoning a man has no constitutional right to work.

The right to work, I had assumed, was the most precious liberty that man possesses. Man has indeed as much right to work as he has to live, to be free, to own property. The American ideal was stated by Emerson in his essay on *Politics,* "A man has a right to be employed, to be trusted, to be loved, to be revered." It does many men little good to stay alive and free and propertied, if they cannot work. To work means to eat. It also means to live. For many it would be better to work in jail, than to sit idle on the curb. The great values of freedom are in the opportunities afforded man to press to new horizons, to pit his strength against the forces of nature, to match skills with his fellow man.

The dictum of Holmes gives a distortion to the Bill of Rights. It is not an instrument of dispensation but one of deterrents. Certainly a man has no affirmative right to any particular job or skill or occupation. The Bill of Rights does not say who shall be doctors or lawyers

or policemen. But it does say that certain rights are protected, that certain things shall not be done. And so the question here is not what government must give, but rather what it may not take away.

The Bill of Rights prevents a person from being denied employment as a teacher who though a member of a "subversive" organization is wholly innocent of any unlawful purpose or activity. *Wieman* v. *Updegraff*, 344 U. S. 183. It prevents a teacher from being put in a lower salary scale than white teachers solely because he is a Negro. *Alston* v. *School Board*, 112 F. 2d 992. Those cases illustrate the real significance of our Bill of Rights.[1]

So far as we can tell on the present record, Dr. Barsky's license to practice medicine has been suspended, not because he was a criminal, not because he was a Communist, not because he was a "subversive," but because he had certain unpopular ideas and belonged to and was an officer of the Joint Anti-Fascist Refugee Committee, which was included in the Attorney General's "list." If, for the same reason, New York had attempted to put Dr. Barsky to death or to put him in jail or to take his property, there would be a flagrant violation of due process. I do not understand the reasoning which holds that the State may not do these things, but may nevertheless suspend Dr. Barsky's power to practice his profession. I repeat, it does a man little good to stay alive and free and propertied, if he cannot work.

The distinction between the State's power to license doctors and to license street vendors is one of degree. The fact that a doctor needs a good knowledge of biology is no excuse for suspending his license because he has

---

[1] As to the right to work, see also *Cummings* v. *Missouri*, 4 Wall. 277; *Ex parte Garland*, 4 Wall. 333; *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Truax* v. *Raich*, 239 U. S. 33; *Takahashi* v. *Fish and Game Commission*, 334 U. S. 410.

little or no knowledge of constitutional law. In this case it is admitted that Dr. Barsky's "crime" consisted of no more than a justifiable mistake concerning his constitutional rights.[2] Such conduct is no constitutional ground for taking away a man's right to work. The error is compounded where, as here, the suspension of the right to practice has been based on Dr. Barsky's unpopular beliefs and associations. As Judge Fuld, dissenting in the New York Court of Appeals, makes clear, this record is "barren of evidence reflecting upon appellant as a man or a citizen, much less on his professional capacity or his past or anticipated conduct toward his patients." 305 N. Y. 89, at 102, 111 N. E. 2d 222, at 228–229.

Neither the security of the State nor the well-being of her citizens justifies this infringement of fundamental rights. So far as I know, nothing in a man's political beliefs disables him from setting broken bones or removing ruptured appendixes, safely and efficiently. A practicing surgeon is unlikely to uncover many state secrets in the course of his professional activities. When a doctor cannot save lives in America because he is opposed to Franco in Spain, it is time to call a halt and look critically at the neurosis that has possessed us.

---

[2] Dr. Barsky was convicted for failure to produce certain documents subpoenaed by a congressional committee. At a hearing before the Regents' Committee on Discipline, the Assistant Attorney General representing the State conceded that Dr. Barsky had acted on the advice of counsel. He conceded that "the advice given to Dr. Barsky by the attorney, Mr. Wolf, was not an opinion which he held alone; nor was it at that time an unreasonable construction of law on his part." The advice given was that the subpoenas were unconstitutionally issued and that Dr. Barsky was not legally required to respond. The Assistant Attorney General admitted that this opinion was held by many lawyers and by some judges. The Committee on Discipline pointed out that refusal to produce the subpoenaed records was "the only method by which the legal objections to the Congressional Committee's course could be judicially determined."