UNITED STATES of America, Libelant,

v.

An ARTICLE of Device CONSISTING OF 2 DEVICES, MORE OR LESS, LABELED IN PART: "LINDQUIST CHRONOSONIC ULTRASOUND MODEL 401B * * * SERIAL 9845 (OR 9846)" "Caution: Federal law restricts this device to sale by, or on the order of, a practitioner licensed by the law of the State in which he practices, to use or order the use of the device" "* * * Lindquist Model S Muscle Stimulator R. J. Lindquist Co. * * * Los Angeles, Calif. * * * Serial No. * * *."

Harold M. Shock, Sr., Intervenor.

Civ. A. No. 981.

United States District Court
W. D. Arkansas,
Hot Springs Division.
June 27, 1966.

Charles M. Conway, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

Fenton Stanley, Malvern, Ark., for defendant.

## OPINION

MILLER, Chief Judge.

This is a civil in rem seizure action instituted by the United States under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. The original libel was filed on April 30, 1965, but described a device or devices that were not then in the possession of the claimant.

On May 21, 1965, the court granted leave to Harold M. Shock, Sr., to intervene in this case. The intervention was filed on June 14, 1965, and called the attention of the court to the fact that the devices listed in the libel of information were not within the jurisdiction of the court and were not in the possession of the claimant. Upon the filing of the intervention, the court granted the United States leave to amend the original libel, and on July 26, 1965, the libelant amended the description of the devices as set forth above, and the devices described in the caption hereof were seized and have been in the possession of the United States Marshal since that time.

Generally speaking, the devices consist of two separate articles or machines for the treatment of ailments, diseases and maladjustments of the human body by the use of ultrasound.

The articles enumerated in the caption were shipped in interstate commerce from R. J. Lindquist Company, 2419 West Ninth Street, Los Angeles, California, to Harold M. Shock, Sr., D.C., 1612 Main Street, Malvern, Arkansas, during the period between March 11,

1965, and May 10, 1965, and it is alleged:

"3. The aforesaid article of device was misbranded while held for sale after shipment in interstate commerce, within the meaning of the Federal Food, Drug, and Cosmetic Act, 21 U.S. C. 352(f) (1) in that its labeling fails to bear adequate directions for use and it is not exempt from such requirement since it fails to comply with all of the conditions for exemption prescribed by regulations 21 C.F.R. 1.106 (d)."

The prayer of the libel is that the court decree the condemnation of the articles and grant libelant the cost of this proceeding against the claimant; and that the article be disposed of as the court may direct pursuant to the provisions of the Act.

The case was tried to the court on May 3, 1966. At the conclusion of the trial it was submitted subject to the submission of briefs by counsel in support of their respective contentions. The briefs have been received and considered along with all of the evidence and exhibits adduced at the trial.

In the brief submitted by counsel for libelant, it is stated:

"The contested issue is whether the devices were misbranded because their labeling did not bear adequate directions for use, within the meaning of 21 U.S.C. 352(f) (1), and whether the exemption of 21 CFR 1.106 applies."

The devices bear the following label:

"Caution: Federal law restricts this device to sale by, or on the order of a practitioner licensed by the law of the State in which he practices, to use or order the use of the device."

It is uncontradicted that the devices were shipped by the R. J. Lindquist Company of Los Angeles, California, to the claimant at Malvern, Arkansas, during the period between March 11, 1965, and May 10, 1965; that the devices contain the label above set forth; and that the claimant is a duly licensed chiropractor with offices at Malvern, Arkansas.

In answer to an interrogatory submitted by the libelant the claimant testified that "the intended use by claimant of the devices seized was to prepare the patient for adjustment. The devices seized have been used only to prepare patients for adjustment and to help patients relax after adjustment." The claimant does not admit any potentiality for harmful effect through the use by him of the devices for such purposes. In answer to Interrogatory No. 16 the claimant stated that he is not licensed to practice medicine in the State of Arkansas; that he is licensed as a chiropractor in the State of Arkansas; and denied that the use of ultrasound devices does not come within the activities permitted by a chiropractor in the State of Arkansas.

■■ The devices proceeded against fall within the definition of the term "device" as set forth in 21 U.S.C. § 321(h). The term "labeling" as used in the Act is sufficiently broad to include all written, printed, or graphic matter appearing upon any article or upon any of its containers or wrappers, or which accompanies the article in interstate commerce. 21 U.S.C. § 321(m). The devices were in the possession of the claimant at the time the libel was filed, and if they are misbranded, they are liable to condemnation, 21 U.S.C. § 334 (a).

Title 21, U.S.C. § 352(f) provides that a device shall be deemed to be misbranded "[u]nless its labeling bears (1) adequate directions for use * * *." Section 1.106 of 21 C.F.R. of the regulations for the enforcement of the Act defines "adequate directions for use" as follows:

"'Adequate directions for use' means directions under which the layman can use a drug or device safely and for the purposes for which it is intended."

The claimant makes no contention that the Secretary has promulgated any regulation exempting the devices involved herein from the above definition of "adequate directions for use."

The libelant in its brief in reference to this provision stated:

"This provision of the law requires that the labeling state each and every purpose and condition for which the product is intended to be used, plus sufficient information to enable any *layman* to use it intelligently, effectively, and safely for each such purpose."

To sustain its contentions the libelant called two witnesses, Dr. L. A. Amick and Dr. Oscar Selke. The claimant called no witnesses, but by agreement with counsel for libelant introduced 47 exhibits consisting of treatises, directions and suggestions relative to the use of the devices, and the diseases, complaints and ailments for which the devices should be used. It is not clear from the evidence whether these exhibits accompanied the devices or whether they were sent by the seller to the claimant for study and guidance in the use of the devices.

The only ore tenus testimony adduced by either party was that of the physicians named above. Their testimony was to the effect that ultrasound is a deep heat modality and is used in making localized applications of heat in the tissues of the body; that ultrasound should be administered only after a careful medical examination and diagnosis to make certain that there are not present conditions for which the use of ultrasound is contraindicated, because the administration of ultrasound in the presence of such conditions could be harmful to the patient. Each of the physician witnesses enumerated a long list of such contraindications. Among the conditions mentioned were neurological defects, circulatory defects, tumors, bones, infections, nerves, pregnant uterus, rheumatic conditions, and eyes and face. They testified that many of these conditions, such as malignant tumors, infections, certain rheumatic conditions, pregnancy, and neurological and circulatory defects, could be reliably diagnosed only by a person with the training and experience of a medical doctor, and that

the blind use of ultrasound without such an examination and diagnosis would be dangerous to the health of the patient.

Based upon the testimony of the two physicians, the libelant contends:

" * * * that no matter what directions are given, the layman does not and cannot possess sufficient knowledge and training to use ultrasound safely. No written directions are adequate to qualify the layman as a medical doctor, and therefore *any* written directions are inadequate to direct the use of ultrasound by the layman."

For that reason the manufacturer labeled the devices as hereinbefore set forth by restricting their use to a practitioner licensed by the law of the state in which he practices to use or order the use of the devices.

Thus, in effect the libelant contends that the claimant, a duly licensed chiropractor, is a layman and that the claimant "is not a practitioner licensed by law in Arkansas to use prescription devices such as ultrasound."

In answer to the contentions of the libelant that the directions for the use of the device are not adequate under which a layman could use the device safely, the claimant in his brief states:

"Wittingly or unwittingly F.D.A. has permitted itself to become a tool in the unfortunate battle between two honorable professional groups, both of which practice the healing art to a definite advantage of all mankind. This case represents another attempt on the part of F.D.A. to maneuver the Federal Courts into ruling whether or not a chiropractor, by the use of various modalities, is engaged in the illegal practice of medicine. Such decision is not for the Federal Courts to determine."

By the enactment of Sec. 72–401, Ark. Stats. (1957 Repl.), the General Assembly of the State of Arkansas created a State Board of Chiropractic Examiners. By Act 187 of the Acts of 1959, Sec. 72–121 (1965 Supp.), the General Assembly created the State Healing Arts Board,

and provided that "no person shall be permitted or eligible to take an examination for a license to practice the healing arts, or any branch thereof, or be granted any such license, * * * unless he has presented to the Board or officer empowered to issue such a license, a certificate of ability in anatomy, physiology, chemistry, bacteriology, pathology and hygiene (hereinafter referred to as the Basic Sciences of the Healing Arts) issued by the State Healing Arts Board." Sec. 72-404, Ark. Stats. (1957 Repl.), requires an examination of applicants for license to practice chiropractics in the State, and provides that the Board shall examine all applicants whose applications have been approved on the subjects of chiropractic —anatomy, physiology, symptomatology, chemistry, hygiene, chiropractic principles and diagnosis. Following the written examination the Board is required to examine each applicant in the art of chiropractic adjusting in such a manner and by such methods as shall reveal the applicant's qualifications. If the applicant is found qualified by the Board, a license shall be issued, which license, "when granted by said Board of Chiropractic Examiners shall entitle the holder thereof to adjust by hand the displaced segments of the vertebral column and any displaced tissue in any manner related thereto for the purpose of removing any injury, deformity or abnormality of human beings."

By Act No. 65, Acts of 1955, the General Assembly of Arkansas created the Arkansas State Medical Board and defined its duties. Ark.Stat.Ann., Sec. 72-602 (1959 Repl.).

Sec. 72-604(1) Act 198 of Acts of 1957 provides that the term "practice of medicine" shall mean:

"(a) holding out one's self to the public within this state as being able to diagnose, treat, prescribe for, palliate or prevent any human disease, ailment, injury, deformity, or physical or mental condition, whether by the use of drugs, surgery, manipulation, electricity, or any physical, mechanical or other means whatsoever; (b) suggesting, recommending, prescribing or administering any form of treatment, operation or healing for the intended palliation, relief, or cure of any physical or mental disease, ailment, injury, condition or defect of any person with the intention of receiving therefor, either directly or indirectly, any fee, gift, or compensation whatsoever."

Subparagraph (2) of Act 198, Ark. Stat. 72-604(2), provides:

"(2) Nothing herein shall be construed to prohibit, or to require a license hereunder with respect to * * (f) the practice of chiropractic as defined by the laws of this state as now or hereafter enacted; this Act is not intended to limit, restrict, enlarge or alter the privileges and practice of chiropractic as now or hereafter provided by the laws of this state."

In 41 Am.Jur., Physicians and Surgeons, Sec. 3, page 135, it is stated:

"At common law the practice of medicine was open to all who desired to follow it in any of its branches, subject only to liability for damages in a case of lack of skill on the part of the practitioner, and to the right of government to proceed by quo warranto to prevent incompetents from following the business. And, as a general proposition, the right to follow the profession of medicine and surgery as a lawful occupation is one of the fundamental rights of citizenship * * *."

At page 162, Sec. 33:

"The power of a state, under its police power, to regulate and control the practice of medicine, either generally or in any of its limited branches, includes the power to prescribe the qualifications which everyone who desires to engage in such practice must possess. And ordinarily these qualifications are prescribed, either generally or with more or less specification, by the legislature."

At page 156, Sec. 27:

"The terms of the statutes involved are largely determinative of the general question whether the practice of chiropractic is the practice of medicine within the meaning of statutes prohibiting the unlicensed practice of medicine. The weight of authority holds that where the prohibitory statute defines the practice of medicine in broad, comprehensive terms, it is violated by the practice of chiropractic, and that it is not so violated, where the statute is phrased in narrow and restrictive words, as where the statute defines a practitioner of medicine as one who prescribes any drug, medicine, or other agency, and the phrase 'other agency,' according to the rule of ejusdem generis, receives such interpretation that it means other agency akin to drug or medicine."

In Barsky v. Board of Regents, (1954) 347 U.S. 442, 74 S.Ct. 650, 98 L.Ed. 829, the court at page 449 of 347 U.S. at page 664 of 74 S.Ct. said:

"It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power. The state's discretion in that field extends naturally to the regulation of all professions concerned with health."

In Dent v. State of West Virginia, (1889) 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623, the court beginning at page 121 of 129 U.S., at page 233 of 9 S.Ct. said:

"It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the 'estate', acquired in them—that is, the right to continue their prosecution—is often of great value to the possessors, and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken. But there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the state for the protection of society. The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud. As one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely; their possession being generally ascertained upon an examination of parties by competent persons, or inferred from a certificate to them in the form of a diploma or license from an institution established for instruction on the subjects, scientific and otherwise, with which such pursuits have to deal. The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession, or are unattainable by such reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation."

In Graves v. State of Minnesota, (1926) 272 U.S. 425, 47 S.Ct. 122, 71 L.Ed. 331, the court, in considering the constitutionality of a Minnesota statute

regulating the practice of dentistry, approved the above quotation from Dent.

The case of Schlessing v. United States, (9 Cir. 1956) 239 F.2d 885, was a proceeding for a review of the denial of the motion of plaintiff to compel administrative approval of a method of distributing certain devices designated as "The Schlessing Ultrasoniseur" in the manner proposed by him. All the devices had been condemned in an action for the seizure of seventy-five of them prosecuted by the United States in the District Court for the Southern District of California. There were only six of the devices involved in the instant suit, and a consent decree had been entered outlining the terms of the distribution of the six devices in controversy. The court approved the terms of the consent decree but eliminated from the findings and conclusions of the trial court all references to the nature of chiropractic, ultrasonic therapy and the practice of medicine and of chiropractors in California. In the discussion of the result reached, the court at page 886 stated:

"The practice of medicine and chiropractic in California is regulated by the legislature and administrative boards of the state. There is no law, regulation or decision of that state which forbids the shipment of an Ultrasoniseur into its boundaries. It is a mooted question whether a chiropractor can use such a device, but it is one for the courts and agencies of California to regulate. The agency has no jurisdiction or authority to attempt to regulate the practice of medicine or chiropractic in that state."

■ The libelant has, as hereinbefore stated, treated and considered the claimant as a layman. He is not a layman. He is a licensed chiropractor, and the ultimate question here is whether this court should determine that he is not "a practitioner licensed by the law of the state in which he practices to use or order the use of the device." It was admitted at the trial that the devices proceeded against were good machines and served a useful purpose, and the court is of the opinion from the testimony of the physician witnesses adduced by the libelant that had these machines been shipped, along with the labeling, charts, etc., to a medical doctor, there would be no authority to condemn them. In other words, the libelant considers the devices acceptable and lawful so long as they are in the hands of medical doctors and not operated by a chiropractor. No witness testified that the devices were dangerous in the hands of anyone but a layman. Neither of the physician witnesses contended that the claimant was not thoroughly qualified to practice chiropractic. The libelant contends in its brief that the license of the claimant is limited to adjustments by hand, and does not authorize the use of deep-heating equipment or any other device. It relies upon the case of Kuhl v. Arkansas State Board of Chiropractic Examiners, (1963) 236 Ark. 58, 364 S.W.2d 790, in support of its contention that the court should hold, as a matter of law, that the claimant was not a practitioner licensed by the law of Arkansas to use or order the use of the device.

In Kuhl the Arkansas State Board of Chiropractic Examiners filed charges against the appellants, William E. and Robert J. Kuhl, alleging that they had illegally engaged in the practice of medicine as charged in a complaint which had been filed in the Chancery Court by the Medical Board, and further that they were guilty of unethical conduct. After hearing all of the evidence, the Chiropractic Board ordered that the appellants' license as chiropractors be revoked. By certiorari the appellants took the case to the Circuit Court of Pulaski County, Arkansas, where the order of the Board was affirmed, and they appealed to the Supreme Court. The only question determined by the Supreme Court was whether, under the facts in the case, the appellants were engaged in the practice of medicine. At page 62 of 236 Ark., at page 793 of 364 S.W.2d, the court stated:

"The printed matter on appellants' statement of account form contains a

list of the treatments they hold themselves out as giving, which are listed as follows:

" '(1) Adjustments, (2) Vitamins or Supplements, (3) Plasmatic Therapy, (4) Traction, (5) Muscle Stimulation, (6) Diathermy [The generation of heat in tissues of the body, as a result of the resistance presented by the tissues to electric currents of high frequency that is forced through them.] (7) Ultrasonic Therapy, [Super sound wave treatment] (8) Infrared Therapy, [Pertaining to or designating those rays which lie just beyond the red end of the visible spectrum, such as are emitted by a hot nonincandescent body. They are invisible and nonactinic and are detected by their thermal effect. Their wave lengths are longer than those of visible light and shorter than those of radio waves.] (9) Ultraviolet Therapy, [Outside the visible spectrum at its violet end; said of rays more refrangible than the extreme violet rays and opposed to infrared.] (10) Ear Irrigations, (11) X-Rays and Fluoroscopy, (12) Endo or Electrocardiogram, [A tracing made by means of the electric needle of an electrocardiograph which shows the contractions of the heart muscle.] (13) Special Interpretations, (14) Laboratory Examinations, (15) Physical Examinations, (16) Basal Metabolism, [The changes going on continually in living cells, by which energy is provided for vital processes and activities in the body, and new material is produced to repair the waste.] (17) Hydro-Therapy [Mineral baths] (18) Blood Count—Urine.' "

Further the court said that the appellants advised other chiropractors to give medication, and furnished forms in connection with taking urine specimens in which they indicated that they could diagnose many diseases, including cancer, by examination of the urine. "All this adds up to the fact that appellants did not confine their practice to that of chiropractics, but also engaged in the practice of medicine. * * * there remains overwhelming evidence that appellants engaged in the practice of medicine, and it is an aggravated case." In conclusion the court said the evidence shows that over a considerable period of time members of the Chiropractic Board had attempted, without success, to get appellants to confine their practice to chiropractics. "In this case, if the Board had failed to revoke the license on evidence which is properly in the record, there would have been an abuse of authority."

■ By the enactment of the statutes heretofore referred to, the General Assembly of Arkansas has provided procedures for the determination of questions as to the qualifications of anyone practicing any branch of the healing arts. Those qualifications are determined by the provisions of the law of Arkansas. The fact that the Federal Food, Drug, and Cosmetic Act is a valid exercise of the authority of Congress to regulate interstate commerce does not authorize this court to determine whether a device shipped in interstate commerce to a chiropractor should be condemned on the ground that he is not a qualified licensed practitioner under the law of Arkansas to use or order the use of the device. Cf. England v. Louisiana State Board of Medical Examiners, (E.D.La.1965) 246 F.Supp. 993, aff'd by Supreme Court, June 29, 1966, 86 S.Ct. 1924. There is no law, regulation, or decision in Arkansas which forbids the shipment of these devices into its boundaries. The question of the qualifications of a chiropractor, such as the claimant, to use the device proceeded against should be determined by the lawfully constituted Arkansas authorities.

■ If the Arkansas State Medical Board is of the opinion that the claimant is engaged in the practice of medicine and that he is without authority under his license to use the device in the practice of chiropractic, the Board, by proper proceeding in the state court, may restrain or enjoin the claimant and oth-

ers from engaging in such practice, or the State Board of Chiropractic Examiners may take such action. Thus, the question can be determined as to whether the claimant is authorized under the state law to use such devices in the practice of its profession. The Federal Food and Drug Administration has no jurisdiction or authority to regulate the practice of medicine or chiropractic in Arkansas.

The libelant does not complain that the label on the devices, "Federal law restricts this device to sale by, or on the order of a practitioner licensed by the law of the State in which he practices, to use or order the use of the device," is insufficient, and does not contend that the claimant is not a practitioner of his profession, chiropractic, but contends that under the law of Arkansas claimant's license to practice chiropractic does not authorize him to use the devices. In other words, the libelant contends that since the physician witnesses designated the claimant as a layman, that such designation makes him such, and that the directions for use as outlined and set forth in the various exhibits are beyond the understanding of a layman. As hereinbefore stated, whether the claimant has a right to use these devices in the practice of his profession is a question that must be determined in a proper proceeding by the state courts. The libelant cannot by merely branding the claimant as a layman limit his practice of chiropractic since he is duly licensed to practice the profession.

The court has heretofore set forth the charges made by the Arkansas State Board of Chiropractic Examiners in Kuhl. The Supreme Court did not hold that a duly licensed chiropractor is not authorized to use the devices involved herein as an aid to adjustments "by hand the displaced segments of the vertebral column and any displaced tissue in any manner related thereto for the purpose of removing any injury, deformity or abnormality of human beings," as revealed by the teachings of the "Basic Sciences," in which an applicant for a license was required to be proficient in order to obtain a license.

Therefore, a judgment is being entered today dismissing the amended libel of information, and ordering the devices restored to the possession of the claimant.