19098

In the Matter of Robert L. CHIPLEY, Jr., Respondent
(176 S. E. (2d) 412)

*Daniel R. McLeod, Esq., Attorney General,* of Columbia, *for Complainant,*

*Carlisle Roberts, Esq.,* of Columbia, *Guardian ad Litem for Respondent,*

August 31, 1970.

*Per Curiam.*

This disciplinary proceeding is before us on a rule requiring the respondent, Robert L. Chipley, Jr., to show cause why a report of the Board of Commissioners on Grievances and Discipline, recommending that he be indefinitely suspended from the practice of law in this State, should not be

adopted. The formal complaint was signed by a member of the Board, who had been designated by the Chairman, pursuant to Section 31 of the Rule on Disciplinary Procedure, to make an investigation. It charges, in the language of Section 4(e), Rule on Disciplinary Procedure, Volume 15, Code of 1962 (Cum. Supp. 1969), that respondent is of "emotional or mental stability so uncertain as, in the judgment of ordinary men, would render a person incapable of exercising such judgment and discretion as necessary for the protection of the rights of others and/or their property or interest in property." This section, in effect, declares that the practice of law by one affected by disqualifying emotional or mental instability is constructive misconduct, subjecting the practitioner to disciplinary action as provided therein.

Carlisle Roberts, Esquire, a distinguished member of the Columbia Bar, was appointed as respondent's *guardian ad litem* and the matter was referred to a panel of three commissioners. In addition to an answer, respondent filed numerous motions and demurrers, which were painstakingly considered by the panel and, with certain exceptions, overruled. These included an objection to the *guardian ad litem* on the ground of conflict of interest, which the panel properly held to be insubstantial. Respondent also objected to the appointment of a *guardian ad litem* upon the ground that he was mentally competent to represent himself. Representation by *guardian ad litem* was required by Section 7 of the Rule, as amended. However, the panel also allowed respondent to participate, *pro se,* in the proceedings. After extended hearings,[1] the panel filed a unanimous report finding that the evidence establishes beyond any doubt respondent's emotional and mental instability within the meaning of Section 4(e) of the Rule, and recommended that he be indefinitely suspended from the practice of law. In due time, and after

---

[1] The panel consisting of John C. Thompson, John O. Woods and G. Miller McCuen, Esquires, met in Columbia on eleven different days between April 28, 1969, and July 21, 1969. The transcript of the proceedings is 1300 pages long. In addition, there are voluminous exhibits.

a full hearing, at which respondent appeared *pro se* and by his *guardian ad litem,* the Board of Commissioners on Grievances and Discipline unanimously adopted the findings and recommendation of the panel, and filed with this court its final certified report of the proceedings. Thereupon, the rule on which the matter is now before us issued.

Mr. Roberts, as *guardian ad litem,* has filed a return which raises two issues:

"1. Rule 4(e) of the Rules on Disciplinary Procedure, under which disciplinary action has been recommended against the respondent, is so vague and indefinite as to deprive the respondent of rights guaranteed him under the due process clauses of both the Constitution of the United States and the Constitution of the State of South Carolina.

"2. The finding that the defendant suffers from mental and emotional instability within the meaning of Rule 4(e) is not supported by the evidence."

The rule provision invoked by the complainant was adopted by the court in the exercise of its inherent power to control its affairs and promote the integrity and responsibility of its officers. Its manifest purpose is to purge the bar of those who because of mental infirmity, although short of outright insanity or incapacity, are unfit to practice law. When read in the light of this purpose, we find no impermissible vagueness in its language.

Of course, an exact formula for measuring disqualifying instability of mind or emotion is unattainable. The criterion of the rule is that the mental instability must be sufficient to render the affected person incapable of exercising in the practice of law necessary judgment and discretion. Whether in a given case this degree of instability is established by the evidence is, inevitably, a question of judgment, to be exercised first by the commissioners in making their finding and recommendation and, finally, by this court in reaching its judgment. The use of the phrase "in the judgment of ordinary men" simply signifies that in deciding whether

disqualifying instability exists, the standards of the perfectionist and of the indifferent are to be avoided, and that of the man of ordinary tolerance for the imperfections of others is to be applied. The argument that this standard subjects an attorney "to as many whims as there are ordinary people * * *" loses sight of the fact that the ordinary man in this sense is a judicial concept, a mythical composite which exists independently of any particular individual, and whose judgment has been relied upon by the common law for ages to resolve questions of fact. The frequently applied test in a somewhat analogous situation, whether a criminal statute violates the constitutional requirement of definiteness, rests upon the same idea, *i. e.*, whether it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." 21 Am. Jur. (2d), Criminal Law, Sec. 17, p. 99 (1965). We conclude that the attack on the rule for unconstitutional vagueness must fail. Cf. Annot., 98 L. Ed. 829 (1954).

Respondent has a long history of commitments to institutions for the care and treatment of mentally ill persons. He was first committed to the South Carolina State Hospital in 1952 on application of his father and certification of two physicians. His condition was diagnosed by the staff as schizophrenia, paranoid type. In 1963 on his father's application and on medical certifications, he was committed to a Veterans' Administration Hospital in Augusta, Georgia. He was committed to the South Carolina State Hospital twice in 1966 and again in 1968. After being conditionally released on December 23, 1968, he was reconfined February 19, 1969, and again conditionally released March 25, 1969. The 1952 diagnosis of schizophrenia, paranoid type, was confirmed on the subsequent commitments. The longest period of confinement was from October 21, 1966, to August, 1967, during which, as a result of respondent's efforts to obtain release from the hospital, the issue of his sanity was tried by a jury in the circuit court for Charleston County. See Section 32-967, Code of 1962. The jury

found that he was mentally ill and in need of custody, care and treatment in a hospital.

Three medical doctors, with extensive psychiatric training and experience, were called as witnesses for complainant. One of these witnesses had examined respondent in Charleston on two occasions in 1966 and had testified in the circuit court upon the jury trial of the issue of his sanity. The other two had been assigned to his case while he was a patient in the South Carolina State Hospital in 1968, and one of them had seen respondent as an outpatient in January, 1969, and during his reconfinement in February and March of that year. These witnesses were unanimously of the opinion that respondent suffers from the mental illness known as schizophrenia, paranoid type, which in respondent is manifested by delusions of persecution, distortion of thinking and serious emotional and mental instability.

Respondent stoutly maintains that he has never suffered from mental illness or instability and attributes each of his commitments to the deliberate misdeeds of others. He characterizes all of them as having been illegal and fraudulent. He presented an impressive body of evidence tending to support his claim that he is free of mental infirmity. This included reports from a qualified psychologist and from a qualified psychiatrist, both, after examination and testing, finding him mentally competent. He also presented the testimony of, or reports from, some thirty other physicians and dentists who had treated him or examined him at various times over the years, some after the commencement of this proceeding, all of whom stated that they had observed nothing abnormal in his demeanor or behavior. A number of respondent's social and professional acquaintances testified to the same effect.

If resolution of the issue depended upon weighing the opinion testimony as to respondent's competency, this evidence would merit most careful consideration. But, this is not the case. The accuracy of the diagnosis of respondent's

condition by complainant's medical witnesses, and that of the staff of the South Carolina State Hospital, is attested beyond peradventure by what respondent, himself, has said and written in the course of this proceeding and theretofore. This may be illustrated by a few references to and brief excerpts from his testimony of July 21, 1969, before the panel.

Upon being invited to state his case in his own way, respondent made a somewhat detailed, but quite appropriate, recitation of his personal history, through graduation from law school and opening a law office in his hometown of Greenwood in 1946. At this point his testimony became rambling, irrelevant and much of it obviously delusional. He testified that, about two years after his return to Greenwood, at the instigation of an officer of the Bank of Greenwood, he was threatened with a beating if he did not close his office and leave town. This was followed by a series of advertisements published by the Bank of Greenwood which were intended to harm him. ("They were published or printed ads; however, they would slip in, from time to time, in their own handwriting, certain types of ads that were to defame or libel me, or carry through their threat of trying to hurt me professionally or make me close up my office. At the same time I got the intimation from these ads that * * * they were compelling me to bank at the Bank of Greenwood by saying, bank only at the Bank of Greenwood. * * * They were libelous, I'll put it that way, and detrimental to me. * * * I was very fearful at night, wondering what they were going to put in the paper the next day, what they would say.[2] * * *") Respondent testified that another bank officer would raise a window shade as a signal every day at 1:00 as respondent passed. ("This went on for a period of two years. This man, Mr. Stewart, flashing at 1:00. I'd pass by here, walking to my father and mother's house for lunch. He'd flash as I would come by there at

---

[2] These ads were published over a period of three years and contained no possible reference to respondent.

1:00. He pull the Venetian blinds up, signaling. No question about it. The game they were playing, these ads were going on in the newspaper at the time, all this stuff was going on.") He also stated that the doctor who lived next door would park his Cadillac under respondent's bedroom window and keep him awake at night. ("He'd come in six times at night in his car and slam the door. He wouldn't give a darn who was there, who had to sleep. He didn't care what time it was. He would slam the door like he was king bee of Jennings Avenue or of the neighborhood, anywhere in Greenwood, and he didn't care who was trying to sleep or anything. Sometimes he would rattle the handle on the door. * * * Dr. Adams was keeping me awake as a lawyer, and besides that, he was making sarcastic, unprofessional remarks.") Respondent stated that he finally became angry at Mr. Stewart and accosted him on the street. ("I called him a dirty word, which if I had been a little more mature, of course, I wouldn't have used * * * but it stopped him from raising the shades, at any rate. It solved that problem. He didn't raise the shades at 1:00 any more on me, and I think the ads were cut down at that time to a certain extent.") Respondent testified that shortly before his 1952 commitment Dr. Adams falsely accused him of spitting in his face. According to respondent, the commitment followed because his father, believing this false charge and hearing that he had cursed Mr. Stewart, thought that he was at fault. ("(M)y father misconstrued it, perhaps somebody else gave him hearsay or misconstrued my intentions, but there was a purpose of my saying these dirty words to Mr. Stewart. That was to stop him from what he was doing, from ridiculing me at 1:00, or trying to signal the Bank of Greenwood at 1:00 for a period of two years. At any rate my father thought I was going around accosting people on the street for no reason at all, or doing things I shouldn't be doing, accosting people, and he actually believed I spit in (Dr.) Adams' face, which I never did. * * *")

In substantial part, respondent's *pro se* argument in this court was concerned with the supposedly libelous advertise-

ments published against him and other wrongs done him during the early years of his practice in Greenwood.

Further reference to the voluminous transcript and equally voluminous exhibits would serve no useful purpose. The only reasonable inference which may be drawn therefrom is that respondent is so affected by emotional and mental instability that he is incapable of exercising in the practice of law necessary judgment and discretion.

We have carefully considered the "brief and objections," the several supplements and additions thereto, and other motions and petitions which respondent has filed *pro se*. Suffice it to say that nothing is presented which casts any doubt upon the correctness of our conclusion that, because of mental illness, respondent is unfit to practice law, nor which excuses us from the performance now of our duty to suspend him from the practice. Respondent's plight arises from mental illness over which he has no control. There is no suggestion of wrongdoing by him. He has our warm sympathy and best wishes.

The court warmly appreciates the arduous and unselfish services performed in this proceeding by the *guardian ad litem* and members of the panel.

Accordingly, it is ordered that respondent be indefinitely suspended from the practice of law in this State, and that he shall forthwith surrender to the Clerk of this Court his certificate of admission to practice.

