**In the Matter of Arthur Daniel DEMPSEY.**

**No. C–84–6748 RFP.**

United States District Court, N.D. California.

Jan. 27, 1986.

---

John Penrose, Asst. U.S. Atty., San Francisco, Cal., for plaintiff.

Arthur D. Dempsey, San Francisco, Cal., pro se.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

### INTRODUCTION

On October 15, 1984, this court issued to Arthur Daniel Dempsey an order to show cause why he should not be disbarred for incompetent and unprofessional behavior before this court. A hearing was held on September 17, 1985, at which time Mr. Dempsey responded to charges of more than twenty specific examples of incompetence or misconduct.

This court has reviewed the evidence and finds that Mr. Dempsey did, in fact, engage in conduct inappropriate for an attorney practicing before this court. The court, therefore, suspends Mr. Dempsey from the roll of attorneys entitled to practice before this court until such time as he has completed the course of remediation described in detail below.

## PROCEDURAL HISTORY

In the summer of 1979, Bernard Altamirano was brought to trial on four counts of distribution of heroin, two counts of assault on a federal officer with a deadly weapon, and one count of being an ex-felon in possession of a firearm. Altamirano's family retained the legal services of Mr. Edward Solomon, who in turn hired Mr. Dempsey. Although both attorneys were of record, Mr. Dempsey acted as lead counsel in all court appearances.

Over the course of pretrial and trial appearances, it became apparent that Mr. Dempsey was not familiar with trial practice before the federal courts. He failed to notice motions in accordance with local rules, attempted to subpoena witnesses in an improper manner, consistently made improper or unintelligible objections to the prosecutor's questions or to opposing testimony, and generally conducted himself in a manner that caused the trial judge to question his competence on more than one occasion.

Mr. Dempsey's behavior was also disrespectful to the court. He ignored the court's rulings on objections, insisted on rearguing old motions, made several inappropriate aside remarks in the presence of the jury, and engaged in heated arguments with the trial judge. The trial judge constantly issued warnings to Mr. Dempsey about his behavior. He twice cited Mr. Dempsey for contempt, and had Mr. Dempsey ushered out of the courtroom on another occasion. The contempt fines were later lifted when Mr. Dempsey made some effort to restrain himself.

Altamirano was convicted on all counts, and appealed his conviction on the ground that he had been denied effective assistance of counsel. The Ninth Circuit found that Mr. Dempsey had conducted himself throughout the trial in an incompetent and unprofessional manner, *see United States v. Altamirano*, 633 F.2d 147, 149–50 (9th Cir.1980), but held that Altamirano was not prejudiced by that conduct, *id.* at 153. At the end of its opinion, the Ninth Circuit recommended that this court institute proceedings to have Mr. Dempsey removed from the roll of attorneys admitted to practice before this court. *Id.* at 154.

An order to show cause was first issued on November 4, 1980. That proceeding was stayed, however, to allow the State Bar to investigate Mr. Dempsey's qualifications. The State Bar completed its investigation, but took no action. On October 15, 1984, a second order to show cause was issued, and the matter was heard on September 17, 1985.

## FINDINGS OF FACT

In this section, the court will review the specific examples of unprofessional conduct and/or incompetence with which Mr. Dempsey is charged. It should be noted, however, that Mr. Dempsey was not charged with every instance of misconduct or incompetence that is reflected in the *Altamirano* trial transcript ["AT"]. Only after reviewing the transcript can one appreciate the disasterous effect an attorney such as Mr. Dempsey can have on the orderly progression of court proceedings. The *Altamirano* trial was constantly interrupted while the judge attempted to maintain order and control Mr. Dempsey's outbursts. The court often had to repeat rulings on Mr. Dempsey's meritless motions and indecipherable objections. And, in the interest of ensuring a fair trial, the judge gave Mr. Dempsey the benefit of every doubt, and often spent time explaining to Mr. Dempsey basic rules of evidence and criminal procedure. The twenty-two charges are only a sampling of the many instances found throughout a record that reflects Mr. Dempsey's shocking inability

or unwillingness to conduct himself in an appropriate manner.

*Unfounded suggestion in pretrial proceedings that federal proceedings were proceedings "removed" from state court.*

During pretrial proceedings on June 28, 1979, Mr. Dempsey made a motion for discovery based on an order issued by a municipal court judge in state proceedings involving the same events as the federal charges. When the court expressed disinterest in the state court proceedings, Mr. Dempsey argued, "Well, this man was removed to this court." (AT 4).

At the disbarment hearing, Mr. Dempsey explained that he merely meant that Altamirano was removed from state custody into federal custody, as was the evidence (Hearing Transcript ["HT"] 3). However, the record shows that Mr. Dempsey was unable to grasp the distinction between the two proceedings. He insisted that Altamirano had been removed to the court, and had lost rights by his "removal" (AT 5–6). He also asserted, in spite of the court's explanation that it had no jurisdiction over state court proceedings, that "it's the same case by the way." (AT 6). This court finds that Mr. Dempsey's explanation is unpersuasive, and that there is sufficient evidence that Mr. Dempsey did not understand that the state proceedings were not binding upon or relevant to the federal proceedings.

*Inadequate understanding of Rule 16 of the Federal Rules of Criminal Procedure.*

Rule 16 of the Federal Rules of Criminal Procedure details the type of information that the government and the defendant must disclose to each other in preparation for a criminal trial. At the June 28, 1979 hearing, the court heard Mr. Dempsey's motion for discovery of, *inter alia:* the names, addresses, and statements of witnesses who might be called to testify against the defendant; and transcripts of the grand jury proceedings at which the defendant had not testified. The court denied the motion, informing Mr. Dempsey

that he had asked for materials to which the defendant was not entitled under Rule 16 (AT 3–4). *See* Fed.R.Cr.P. 16(a)(2), 16(a)(3).

In spite of this ruling, Mr. Dempsey continued to argue the motion on the ground that he would have been entitled to the discovery in state court (AT 4). He also made factual assertions about discrepancies in the evidence, and the unwillingness of the San Francisco Police to discuss the case with him (AT 7). When the court asked for affidavits or declarations supporting these factual allegations, Mr. Dempsey admitted that he had filed none (AT 7–8). The court then denied the motion on the additional ground that Mr. Dempsey had failed to follow local rules in regard to making factual assertions (AT 8–9).

When Mr. Dempsey continued to ignore the fact that the court had ruled on his motion, the court admonished him to comply with the ruling, and suggested that Mr. Dempsey "read the rules sometime and become qualified to practice in this court" (AT 9). Mr. Dempsey continued to argue the motion, while the court tried to educate him regarding the limits of Rule 16, and the nature of an indictment by a grand jury (AT 9–10). Finally, after Mr. Dempsey admitted that he had not recently tried a criminal case in federal court, the court suggested that he contact the federal public defender's office for assistance (AT 25–26).

At the disbarment hearing, Mr. Dempsey again tried to explain the basis of his motion, asserting that he was only trying to get evidence his client was entitled to because it had been gathered by the San Francisco Police Department. He stated, "After all, my client is a taxpayer in California. My client is a citizen. He has a right to look at evidence that was in the hands of the police." (HT 7–8). Mr. Dempsey also asserted that "[n]obody would hear the motion, because they just wouldn't shorten time for [him]." (HT 8). But the record reflects that the trial court heard and ruled on the merits of Mr. Demp-

sey's motion in spite of his failure to comply with local rules. The record also shows, and this court finds, that Mr. Dempsey did not understand Rule 16, even in its simplest applications.

*Confused arguments concerning motions leading to court's suggestion that counsel might be removed.*

At a hearing on July 19, 1979, Mr. Dempsey brought another motion for discovery and a motion to suppress evidence. Both motions were denied because Mr. Dempsey had failed to comply with local rules regarding notice. Mr. Dempsey had filed the motions three days before the hearing, without asking for an order shortening time. The court noted that it had not been able to get Mr. Dempsey to comply with local rules, and stated that it was thinking of removing Mr. Dempsey from the case "for being a rather incompetent counsel." (AT 59).

Thereafter, the following exchange occurred between Mr. Dempsey and the court:

The Court: You will not observe [the rules].

Mr. Dempsey: It's not that. It's just that I have filed in this case seven motions and one writ.

The Court: And—

Mr. Dempsey: The United States Attorney hasn't even filed one paper, or, indeed made an argument. Every time I come up here, I end up arguing with your honor. The United States Attorney stands with his arms folded.

The Court: The United States Attorney—The United States Attorney would be perfectly justified if he came in and moved to strike these so-called motions of yours for noncompliance with the rules of this court.

Mr. Dempsey: Well, let's do it and then you can deny them and we'll start the trial. I mean, that's—That's my thought. I mean—

The Court: Well, I'm going to deny them.

Mr. Dempsey: Good. Thank you.

(AT 59–60). And with respect to the requirement of notice to the United States Attorney, Mr. Dempsey argued: "Why do I have to give notice to the United States Attorney when he knows the date, he knows the motion's going to be made, and, indeed, he probably knows what the motions are going to be based on." (AT 60).

At the disbarment hearing, Mr. Dempsey's defense was much the same: "Why does [the United States Attorney] need twenty days notice of a motion that he set the date for in the first place? I don't have to tell him the motion is going to be next Tuesday. He knows the motion is going to be next Tuesday." (HT 6). This court finds that Mr. Dempsey's continued failure to abide by local rules was a symptom of incompetence. Moreover, his argument to the court regarding his failure to abide by those rules was not only meritricious, but was also sarcastic and disrespectful to the court.

*Unprofessional insistence on rearguing points already ruled on by trial court.*

Mr. Dempsey tried to bring the motions again on July 30, 1979. The trial court reminded Mr. Dempsey that it had denied those motions on the merits as well as on procedural grounds, but agreed to rule on them again later that week when the notice requirement had been met. When asked a question about a new motion to suppress a taped interview of the defendant, Mr. Dempsey responded with argument on the previously denied motions. He stated:

May I say, since I came in this case I have made nine motions and I have answered [sic] the two same questions. But he wants to create a question, nobody wants to answer the questions they've been asking since June 26, which are going to have to be answered sooner or later. And those two questions are this:

The first question is: Number one, where the government impounds documents that come in a state court, can the government keep those private if there is an order of a state court giving them to the defendant or are they prop-

erty of the defendant that he may have under Rule 16? First question, never answered.

The second question is: Can the defendant be brought from a state court into a federal court with the delay that's gone on here and tried in a national tribunal for what amounts to a common law crime? What are the answers? (AT 89).

When told by the court that the answer to the latter question was "Yes," Mr. Dempsey responded that there was a law review article that said the question had never been answered (AT 90).

■ At the disbarment hearing, Mr. Dempsey admitted that he did not know the local rules regarding notice, and defended himself by saying, "I have never claimed to be a copy of Moore's Federal Practice with legs on." (HT 9). This court finds that Mr. Dempsey's arguments reflect his lack of familiarity with Rule 16, his inability to separate the state and federal proceedings, and his lack of competence to try criminal cases in federal court. The court also finds his insistence on rearguing old motions, instead of responding to the court's questions on the motion before it, unprofessional as well as further evidence of incompetence.

*Unprofessional conduct and argument to trial judge.*

On August 2, 1979, Mr. Dempsey again brought a motion seeking discovery. At that hearing, Mr. Dempsey accused the government of instructing witnesses not to talk to the defense (AT 96–97). Mr. Dempsey had no evidence to support that accusation other than his own affidavits, which were not based on personal knowledge (AT 98). And, in spite of Mr. Dempsey's continued protestations that the defense did not have access to evidence in the government's possession, Mr. Dempsey could not specify any item of evidence to which he was entitled under Rule 16 that he had been denied (AT 102–03).

It also became evident that Mr. Dempsey was asking for discovery of police investigative reports that were not in the government's possession (AT 106). The court had to explain, once again, that, other than its power to issue a subpoena, it had no control over San Francisco police officers (AT 106–07). This did not impress Mr. Dempsey who felt that it "wouldn't hurt anything" for the trial court to order that certain San Francisco police officers talk to him, so that he could avoid making out subpoenas (AT 113).

Mr. Dempsey's motion to suppress was also brought on the basis of the delay between defendant's arrest by police and his indictment by the federal grand jury. Again, Mr. Dempsey was unable to distinguish between the point at which defendant was in police custody, and the point at which he came to be in the custody of the United States (AT 108–09). Finally, frustrated at the incoherence of Mr. Dempsey's argument, the court denied the motion on its merits. Mr. Dempsey continued to try to make an argument based on California rules of criminal procedure and *Miranda* (see below), provoking laughter in the courtroom, and forcing the judge to state his ruling again (AT 109–10).

■ Mr. Dempsey's comments at the hearing were unresponsive to this charge. The written response filed on his behalf merely states that he was attempting to bring the difficulties he was experiencing in his investigation to the court's attention. *See* Response to Order, at 5. This explanation is inadequate in light of Mr. Dempsey's inability to understand the limited jurisdiction of the federal court and the distinction between federal and state proceedings. The court finds that Mr. Dempsey's conduct was evidence of incompetence. And Mr. Dempsey's request that the court issue an order it had informed him would be improper was unprofessional.

*Motion based on farfetched application of Miranda.*

■ In the process of arguing the motion to suppress, Mr. Dempsey tried to show a violation of Rule 5, Fed.R.Cr.P. 5 (Initial Appearance before the Magistrate), by making the following argument:

Obviously when a man is arrested, under our procedures, he has to be brought before a magistrate. Under California law, within 72 hours. That's what happened here. That's how he got into state custody. He was—in 72 hours, he was arraigned before a magistrate even though he was in the hospital, and that proceeding started the United States government and, as I understand the federal rule, under our procedure, a man has to be given a *Miranda* warning by a police officer under the federal procedure, and that morning he must be given it by a magistrate.

He didn't get a warning by a magistrate for two months and that violates the rule number 5. Well, doesn't it? (AT 110).

This argument speaks for itself and is further evidence of Dempsey's incompetence to practice before this court. At the disbarment hearing, he agreed with the charge, but proceeded to explain one of his other farfetched fourth amendment arguments. His excuse was that the defendant wanted the argument made and he had no choice (HT 10). This court recognizes that attorneys in criminal cases are given more latitude in defending their clients than attorneys in civil cases. However, even motions that border on being frivolous must have some basis in logic. Mr. Dempsey cannot be absolved of responsibility for his incompetence merely by asserting that his client wanted him to make an argument. Finally, the argument that Mr. Dempsey suggests that his client wanted him to make is not the one that generated this charge.

*Improperly tendered jury instructions.*

█ In preparation for trial, Mr. Dempsey tendered 87 jury instructions. Some of the instructions failed to indicate the supporting authority, and many were overlapping instructions. Mr. Dempsey's defense is that it is the judge's responsibility to determine which instructions are relevant (HT 11). The trial judge does, of course, have the ultimate responsibility to determine which jury instructions will be given; but an attorney may not submit jury instructions without taking some responsibility for their relevance to the case being tried.

Without more, this particular offense would be more of a nuisance than an example of conduct deserving professional sanction. Nevertheless, such conduct adds weight to this court's previous findings that Mr. Dempsey's performance was generally substandard.

*Unprofessional confrontation with trial judge concerning the proper manner to subpoena witnesses.*

On August 27, 1979, the morning that trial was to begin, Altamirano indicated that he no longer wanted Mr. Dempsey to represent him (AT 121–26). One of the reasons Altamirano gave for wanting a new attorney was that "not all the right witnesses ha[d] been contacted" (AT 124). Mr. Dempsey complained that he had not been able to get the Marshal to serve papers; but admitted that he had not yet filed an In Forma Pauperis affidavit (AT 126–27). The court explained that since Mr. Dempsey was retained counsel, it was especially important for him to file the affidavit, because the Marshal could not serve any papers without it (AT 127). Mr. Dempsey responded:

May I finish what I am saying? You know part of the problem here has been the court's continually jumping on me and telling this man that we don't know what we're doing. I've said that to the Ninth Circuit. There's a writ up in the Ninth Circuit sitting in there now. Every time we walk into this courtroom —(AT 127).

He resisted the court's attempts to get him to listen, until the court finally stated, "There will not be this kind of colloquy now, let me warn you, because if you don't want to get into some difficulty, let's avoid that." (AT 127–28).

At the disbarment hearing, Mr. Dempsey stated that his witnesses had come, in spite of being improperly subpoenaed, but that the United States Attorney had told them they did not have to stay (HT 12–13). He claimed that all of his witnesses then left

the courtroom, and that he was not able to get some of them back (HT 13–14). The record tells a different story. It reflects the patience with which the trial judge questioned Mr. Dempsey about what he needed from each witness, and the assistance the judge gave Mr. Dempsey in obtaining that information before each witness was excused (139–53, 310–44).

Mr. Dempsey also told this court that he had served the witnesses himself because he was very suspicious of the "fellow" in the Marshal's office (HT 13). He continued:

All right. I know maybe that wasn't the proper thing to do, but I went out and served them. That is not the first time I have done that. I have served subpoenas beyond the 150 mile limit in state courts. I have done this before. But how I get witnesses into court is my problem. If I put them in a barrel, if I tie them up, If I trick them in here, once here in this courtroom, they are my witnesses. I don't care how—what anybody says, those were my witnesses. And I had them here in this court and I got them here (HT 13).

This court finds that Mr. Dempsey's comments to the *Altamirano* court were disrespectful and unprofessional. The court is also disturbed about Mr. Dempsey's unsubstantiated factual assertions about interference with defense witnesses made both during the trial and at the disbarment hearing. Finally, the court takes note of Mr. Dempsey's lack of ethics in obtaining witnesses and his inability to adhere to established rules of procedure.

*Unprofessional conduct regarding the payment of fees to serve subpoenas.*

On August 19, 1979, before trial began, the matter of improperly subpoenaed witnesses was before the *Altamirano* court again. The United States Attorney brought the witnesses forward as a courtesy to the court (AT 310–11). Mr. Dempsey complained that there was great irregularity in the fact that the United States Attorney was "interfering" with subpoenaed witnesses (AT 312). The trial court attempted to explain the proper method of subpoenaing witnesses, and informed Mr. Dempsey that he could not subpoena witnesses without paying one day's witness fees and expenses (AT 312–13).

The court then tried to ameliorate the problem, by asking Mr. Dempsey what he needed from each witness. After he made sure that Mr. Dempsey had gotten the information that he wanted, the judge excused the witnesses (AT 318–40). Mr. Dempsey asserted that he thought the government was supposed to pay witness fees in criminal cases, but was corrected by the trial court. Mr. Dempsey then stated that he did not have the money to pay for witnesses (AT 347). When the court reminded him that he had, in his own words, been "paid a substantial fee," Mr. Dempsey contradicted that statement and asked to be let out of the case. He also stated, "After all, the law is a business. I'm sure if Your Honor wasn't paid or the United States Attorney wasn't paid your salaries, you wouldn't be here. I don't know why I have to subsidize the government." (AT 347–48).

Mr. Dempsey's explanation at the disbarment hearing was much the same. He argued, "Let me tell you something. In that courtroom ... we were up to our ears in $35,000 a year clerks, $50,000 a year United States Attorneys standing around in $200 suits. Who do you think pays our office rent? Who supports our families?" (HT 14). This court finds Mr. Dempsey's comments irrelevant and unprofessional. They do not excuse his failure to properly subpoena witnesses. That failure was based on Mr. Dempsey's lack of familiarity with the proper procedures, and his misguided assumption that the government would pay for his client's witnesses.

*Unprofessional aside remark in presence of jury followed by finding of contempt.*

Once trial began, Mr. Dempsey's performance was characterized by improper objections interspersed with proper objections, improper colloquy, and sarcasm. The court asked Mr. Dempsey to desist

from making asides and engaging in colloquy. At one point the court asked whether Mr. Dempsey had further questions for a prosecution witness. Mr. Dempsey indicated that he had none, then changed his mind and became agitated when the witness was excused. When the prosecution called the next witness, Mr. Dempsey commented, "Your Honor, I know how anxious the District Attorney [sic] is to clang the prison doors behind my poor client, but I mean, just a minute, if you mind." (AT 547). At that point the court warned Mr. Dempsey that any more gratuitous statements would result in a finding of contempt (AT 547). But Mr. Dempsey refused to restrain himself, and was finally cited for contempt (AT 548).

Thereafter, Mr. Dempsey tried to impeach the excused witness, complaining that he had not had an opportunity to play a taped conversation. The judge reminded Mr. Dempsey that he had stated that he had no further questions of the witness, and tried to ascertain the gist of Mr. Dempsey's complaint. Mr. Dempsey stated that he was trying to use his notes of the taped conversation to let the jury hear how different the witness's statement in court was from his prior statements. The following exchange then ensued:

The Court: Mr. Dempsey, will you, for heaven's sake, desist from making those gratuitous statements? I have never had the experience of having a lawyer who insisted on a stream of chatter when he was addressing the court on serious matters that affected his client's defense.

Mr. Dempsey: Your Honor, I'm not unmindful of—of the serious trouble I can be in. But, on the other hand, I'm not fearful, either. Because I'm here to represent Mr. Altamirano. And if I have to go to jail to represent Mr. Altamirano, I'm perfectly willing to do so. I wouldn't like to have to, but I'll do it. But the thing is, what's happened here is—and I think everybody can hear my voice—

The Court: Mr. Dempsey, I'll not have another word from you on that.

Mr. Dempsey: All right.

The Court: Now, if I have to, I'll give you a second [contempt] citation.

Mr. Dempsey: All right.

The Court: Now just—just contain yourself.

Mr. Dempsey: I think I contain myself very well, your honor.

The Court: I want to say to the jury that it's unfortunate that there are loud voices in the courtroom.

Mr. Dempsey: But your honor, I have not spoken loudly. I have not. I don't think that's so.

The Court: Would you be—

Mr. Dempsey: I mean you're characterizing—(AT 550).

At this point the judge found it necessary to excuse the jury, admonishing the jurors, "I do not wish [the factfinding] function of the jury to be distorted because there are episodic problems in the courtroom." (AT 551). Once the jury had been excused the trial judge lectured Mr. Dempsey:

Let me tell you, I have practiced law 38 years, and I have seldom encountered a lawyer who so continuously insisted upon a stream of comment and chatter in the presence of a jury. I will not tolerate it. I will not tolerate it from any lawyer on whatever side.

Now, let me tell you something sir: This is a United States District Court. It is not a circus or a justice of the peace court. And if you're going to perform the functions of a lawyer, you will do so with dignity, with courtesy and with some kind of proper observation of the court's admonitions and rulings. I will not have that.

Do you follow me? (AT 552–53).

Even this was not enough to quell Mr. Dempsey's sarcasm and belligerence. The trial judge once again threatened to find Mr. Dempsey for contempt and to jail him (AT 553–54). The proceedings were thereafter adjourned (AT 555).

Mr. Dempsey's explanation of this incident was unresponsive. He suggests that he said the trial was going too fast, and

that he made a mistrial motion (HT 17). He also believes he may have said that it was difficult to try the case under threat of contempt (HT 17). This court finds that Mr. Dempsey's remarks were unprofessional, and his conduct disruptive and disrespectful.

*Heated exchange with trial judge over cross-examination of a government witness.*

At trial on August 30, 1979, Mr. Dempsey was trying to establish, through cross-examination of an Officer Dijamco, that a suspected accomplice of Altamirano had been shot more times than government witnesses had testified. He was trying to interpret a coroner's report without benefit of expert testimony. The government objected, and the court attempted to instruct Mr. Dempsey how to conduct a proper cross-examination. When Mr. Dempsey asked for an explanation of the fact he was trying to show, which was not a fact in evidence, the government objected again, and the court excused the jury.

The court tried to ascertain what evidence Mr. Dempsey had that there were five bullet wounds instead of four. When Mr. Dempsey indicated that he had counted the number of organs affected, the court tried to explain that one bullet might affect multiple organs, depending on the path it took. Mr. Dempsey began another tirade, causing the trial judge to ask him to shut up (AT 589), and conduct himself like a lawyer and not like a buffoon (AT 590). Mr. Dempsey continued to be upset and stated: "But don't you see? You've scared Mr. Solomon to Denver. He isn't even here anymore. You've got me under threat of contempt." (AT 593).

The trial judge cited Mr. Dempsey for contempt and fined him $250 (AT 593). Mr. Dempsey responded that he did not have the money, and stated further, "But the thing is, though, that every time I get close to something with one of these witnesses, I'm held in contempt. The witness—the hearing stops. I have been threatened with contempt every time—" (AT 594). Mr. Dempsey continued in this manner,

with brief interruptions by the trial judge, making statements such as, "Every time I get near the facts, I'm in trouble." (AT 595), and "Every time I want to ask that question, you hold me in contempt. Every time I get near the facts, the whole world explodes." (AT 597–98). It was finally necessary for the trial judge to have Mr. Dempsey removed from the courtroom by the Marshal (AT 598).

At the disbarment hearing, Mr. Dempsey explained that he thought that the number of shots was a "big hidden fact" that "everybody was waiting for." (HT 19). Whatever Mr. Dempsey thought, he was not to impugn the integrity of the trial court by making the unfounded suggestion that it was trying to prevent him from bringing out the truth. This court finds that Mr. Dempseys conduct was disrespectful and unprofessional.

*Unprofessional objection to trial judge's consultation with defendant regarding representation afforded him.*

After Mr. Dempsey returned to the court, the trial judge questioned the defendant as to how he felt about the way his trial was proceeding, and whether he felt he could have a fair trial with Mr. Dempsey as his lawyer. Mr. Dempsey objected, suggesting that it was illegal for the court to communicate with the defendant (AT 600), and accusing the judge of trying to come between him and his client (AT 601).

At the disbarment hearing, Mr. Dempsey again expressed his concern about incriminating statements his client might have made to the judge (HT 20). While this court understands Mr. Dempsey's concern, it notes that Mr. Dempsey handled the situation in a belligerent and unprofessional manner.

*Defective cross-examination technique.*

In examining the transcript at the pages cited (AT 625–27), the court finds that Mr. Dempsey's technique was poor, but not so poor as to deserve sanctions. Mr. Dempsey's cross-examination technique fluctuated throughout the trial from incompetent to adequate. Nevertheless, the cited example, while demonstrating that Mr. Demp-

sey's performance was generally substandard, does not reach the level of incompetence found in other parts of the trial transcript.

*Improper objection.*

Throughout the trial, the judge found it difficult to get Mr. Dempsey to frame his objections properly. Mr. Dempsey tended to object, and then speak generally about why he did not like the evidence, without stating any legal ground for its exclusion. In this particular case, the prosecution offered testimony about papers that were allegedly found in Altamirano's wallet which was seized at the hospital. Mr. Dempsey interrupted:

> Your honor, I'm going to object. There's a—I haven't heard that this is the product of a search warrant by my client. It appears to be his personal papers and documents and I don't know why—(AT 737).

The court asked Mr. Dempsey to stop "run[ning] off like a fountain" so that it could find out what the objection was and rule on it (AT 738). Mr. Dempsey argued that the officers needed a search warrant because the search was not incident to an arrest. The court explained that the defendant had been in custody at the time the wallet was seized, but Mr. Dempsey insisted that he could not be under arrest if he was being treated in the hospital for injuries sustained during his altercation with government agents (AT 739–40).

Mr. Dempsey's comments at the disbarment hearing were not responsive (HT 26). The court finds that this objection illustrates Mr. Dempsey's inability to grasp the facts surrounding his client's arrest.

*Unprofessional aside remark in the presence of the jury denigrating the government's proffered evidence.*

On September 4, 1979, while presenting its case in chief, the prosecution offered into evidence the passenger seat of the car in which the government agents had allegedly been shot by Altamirano. Dempsey objected, saying "My client says that that's not the seat. It was a brown seat, he believes, ..." (AT 882). The judge held

him in contempt for making such a remark in front of the jury, admonishing him to act as a professional. When Mr. Dempsey continued to argue, the judge excused the jury (AT 882). The judge then fined him $100, stating: "You're the most unprofessional person I have ever seen in a courtroom of this kind. You act as if you have no training of law, you have no discipline at all." (AT 883).

At the disbarment hearing, Mr. Dempsey could not understand why his objection was improper. He excused his conduct saying, "Mr. Altamirano turned around and said that to me. I had to put forward his case. He said that is not the seat cover. It was Mr. Altamirano's case, after all, not mine." (HT 27). This court finds that Mr. Dempsey's conduct was unprofessional. Such conduct also provides further evidence of Mr. Dempsey's incompetence.

*Frequent use of argumentative and testimony-laden questions in cross-examination.*

Throughout the trial, Mr. Dempsey had to be admonished for arguing and testifying as part of his cross-examination. One example, discussed above, was his attempt to show that Mr. Castro had been hit by five bullets rather than four. On September 5, 1979, Mr. Dempsey attempted to have the San Francisco County Coroner testify about events that occurred before he arrived at the scene of Mr. Castro's death. When the court reminded him that such testimony was outside the expertise of the coroner, Mr. Dempsey asked. "Now Doctor, was I right in hearing you saying that you could not accept the statements of the officers as to the death of—as to the manner of death of David Castro." (AT 1016). This did not accurately reflect the testimony of the witness, which was that Mr. Castro might have been shot four *or* five times (AT 1006).

Later, on direct examination of his client, Mr. Dempsey began his question by recounting the testimony of another witness (AT 1151). When asked by the court what he was doing, Mr. Dempsey stated: "I'm trying to get [Altamirano] to the point

where he remembers what we're talking about." (AT 1151). At another point it became obvious that Mr. Dempsey was reviewing transcripts and making observations instead of asking questions. For example, he stated, "Now there's a great deal of talk, as I recall, about your source being paranoid and he was getting the stuff in China. And what was all that?" (AT 1180). And later, "The question is, it would seem to me that he in effect is saying that he called Jerry and Jerry—to get together with you. It seems to me that rather than what you're telling us, it's the other way around, that you're the source. Is that right?" (AT 1192).

Mr. Dempsey's explanation at the disbarment hearing was, again, unresponsive (HT 27–30). This court recognizes that attorneys will occasionally ask leading questions on direct examination. However, Mr. Dempsey was not merely asking leading questions; he was testifying and arguing as part of the questions. Moreover, while once or twice in the course of an examination might have been excusable, it was necessary for the court to constantly admonish Mr. Dempsey to ask questions of the witnesses instead of engaging in colloquy. This court finds, therefore, that Mr. Dempsey's overall performance failed to meet minimum standards of proficiency and professionalism.

### Objection by counsel to question put by prosecuting attorney.

This charge relates to three occasions when Mr. Dempsey objected to arguably improper questions asked of Mr. Altamirano by the prosecuting attorney. The first questioned whether a government agent had lied when he testified that Altamirano took out a gun and shot the agent in the back of the head (AT 1328). After the court had ruled on the objection, Mr. Dempsey continued to argue that "the question of whether or not [the agent] may be commiting perjury is hardly a question to be decided by [Altamirano]." (AT 1328).

Later, the prosecutor asked Altamirano whether he had been drunk on one of the dates on which he was accused on distributing heroin. Mr. Dempsey objected: "That's asking about a crime and a misdemeanor, at that. You can't impeach the defendant with a misdemeanor, being drunk in public. He's not on trial for being drunk." (AT 1350).

And, on September 11, 1979, Mr. Dempsey objected to a leading question asked on cross-examination about a charge that Altamirano had broken into the home of a Mr. Aulday. The prosecution asked, "And is it a fact that you had some screwdrivers on that occasion?" Mr. Dempsey objected, "Why doesn't the United States Attorney just take the oath and get on the stand? He's doing a lct of testifying. He is not asking questions." (AT 1435).

Mr. Dempsey could offer no comment upon this charge (HT 30). The first two objections missed the point of the prosecutor's questions, and the third was a disproportionate reaction to routine cross-examination. While these objections, standing alone, would not be cause for alarm, in the context of Mr. Dempsey's other disruptive and incompetent behavior, they add weight to the court's finding that Mr. Dempsey should not practice before the federal court.

### Unprofessional objections during cross-examination of defendant by prosecution.

Just before the second example discussed above, Mr. Dempsey objected to another question asked Mr. Altamirano by the prosecutor. The question was: "Did you ever get in a car with [a Mr. Gamino] in Orange Alley between 25th and 26th street on November 24, 1978?" Dempsey objected that the question assumed a fact not in evidence (AT 1348). When the court overruled the objection, Mr. Dempsey continued to argue until the court told him to sit down (AT 1348). The following exchange occurred:

The Court: You know, this really is not going to be a circus.

Mr. Dempsey: It's not a circus sir.

The Court: Now I've—I've spoken to you. We've had a little discussion, and I want to call it to your attention: When

you hear me rule, I don't then invite further speeches, Mr. Dempsey.... (AT 1348–49).

At the disbarment hearing, Mr. Dempsey indicated that there was not enough in the papers he had to respond to this charge (HT 30). Of course, transcripts of the *Altamirano* pretrial hearings and trial were available at Mr. Dempsey's request. The fact that he chose not to make use of them may be a sign of his continuing incompetence as an attorney. This court finds that Mr. Dempsey's failure to observe the trial court's rulings was unprofessional.

*Unprofessional comments on behavior of prosecution during cross-examination of defendant.*

During the trial the defendant maintained that he had not had a gun. In questioning him about the shooting of one of the government agents the prosecutor asked, "In any event, what you're telling us is you never pulled the trigger like that (indicating), is that correct?" Mr. Dempsey interrupted: "May the record show that the District Attorney [sic] has picked up a gun and pointed it—I don't know whether at the jury or not—and he clicked it audibly in the courtroom pointing at I don't know who." (AT 1374). When the court told Mr. Dempsey that the gun had been pointed up and not at anybody, Mr. Dempsey continued, "I don't want the gun pointed at anyone anywhere in the courtroom, especially when there's shells in the courtroom." (AT 1374). At this point the trial judge indicated that he was "fed up," and called a recess (AT 1375).

At the disbarment hearing Mr. Dempsey indicated that he did not have enough information to tell what the charge was about (HT 30). Nevertheless, Mr. Dempsey had access to the necessary information. The court finds Mr. Dempsey's statements about the prosecutor's behavior inflammatory and unprofessional.

*Unprofessional outburst.*

During cross-examination of an Officer Gamble, Mr. Dempsey asked, "Did the District Attorney stand up and state these were federal agents?" When the prosecu-

tor objected Mr. Dempsey argued, "I have let his hearsay in. I don't know why the heck I can't have a little hearsay. It's all hearsay." (AT 1514). Mr. Dempsey explained that he just wanted to get in a particular piece of evidence (HT 31). Nevertheless, the court cannot condone tantrums from attorneys practicing before this court, merely because they are disappointed with the court's evidentiary rulings.

*Conduct described by the trial court as "professionally obstreperous and obnoxious."*

Minutes later Mr. Dempsey accused the officer of testifying that there was an outstanding state warrant for Altamirano when "there is no outstanding warrant and the United States Attorney knows this." (AT 1517). The court then called both attorneys to side bar and warned Mr. Dempsey that the next time he made that kind of statement he would spend the night in jail for contempt (AT 1518). Mr. Dempsey continued to try to argue that everybody knew that the warrant was dismissed, and asked that the record show that the warrant had been produced in court (AT 1518). The judge corrected Mr. Dempsey, stating that he had never seen a warrant (AT 1519). When the prosecutor offered to produce certification that the warrant was still pending, Mr. Dempsey indicated, once again, that he thought the state and federal proceedings were intertwined. He asserted that the warrant could not be pending as a matter of law because the defendant had been in custody for more than 90 days (AT 1519). The court, once again, reminded Dempsey that Altamirano was not in state custody.

After further remarks by Mr. Dempsey the court stated:

I am going to tell you, Mr. Dempsey, I have never seen a lawyer with the behavior that you exhibit in court. I am telling you that this is going to be the worst— You make it hard for the court to proceed without having to come down hard on you, but when this trial is over, I am going to tell you I am going to commit

you, because I am absolutely just at a point where I agree it's impossible for anybody to be as professionally obstreperous and obnoxious as you are. (AT 1520).

Mr. Dempsey did not recall that the judge had made these remarks (HT 31), and conjectured that he had, perhaps, argued too strongly over the evidence (HT 32). The court finds that Mr. Dempsey's factual assertion, made in the presence of the jury, that the United States Attorney was allowing his witness to lie about the outstanding warrant, was unprofessional.

*Unprofessional effort, in closing argument, to jury, to use trial court's rulings against the prosecutor, leading to criticism of Mr. Dempsey's unprofessional conduct.*

■ During closing argument, Mr. Dempsey referred to the evidence that Mr. Castro may have been shot more than four times. He stated: "They come up here with a fellow, he doesn't know anything about it, there just aren't any—And if somebody wants to testify, it's not allowed, I can't bring it in." (AT 1662). The trial judge interrupted him and warned him to stop arguing to the jury about the wisdom or propriety of the court's rulings (AT 1662–63).

Mr. Dempsey's explanation was not a direct confirmation or denial (HT 32–33). It was merely a speech about effective conduct in front of a jury. The court finds that Mr. Dempsey's attempt to draw the trial court's rulings into question was unprofessional and disrespectful.

## CONCLUSIONS OF LAW

A. *Relevant Standards of Professional Conduct*

Prior to the hearing on this matter, Mr. Dempsey filed a motion for dismissal or for summary judgment. He asserted that he was entitled to summary judgment because reasonable attorneys might differ as to the propriety of his conduct. This court disagrees. A reasonable attorney who read the transcript of the *Altamirano* trial would be unable to ignore the blatant violations of the various rules and codes of professional conduct.

■ The rules that were in effect at the time of the *Altamirano* trial and those that are in effect now establish the objective standard by which an attorney's conduct is to be measured. The American Bar Association's Code of Professional Responsibility ("Code"), superceded by the Model Rules of Professional Conduct ("Model Rules") in 1983, California's Rules of Professional Conduct ("California's Rules"), and the Northern District of California Local Rules ("Local Rules"), all proscribe the type of conduct engaged in by Mr. Dempsey. Mr. Dempsey is required to comply with California's Rules and the Local Rules by the rules of this court. *See* Northern District of California Local Rules, Rules 100–3, 110–3 (effective 1977). The other rules provide guidance with respect to accepted standards of professional behavior.

"[A] member of the [bar] shall not accept employment or continue representation in a legal matter when the member knows that the member does not have ... sufficient time, resources and ability to perform the matter with competence." California Code of Professional Responsibility, Rule 6–101 (1975). *See also* A.B.A. Code of Professional Responsibility, DR 6–101(A)(1) & (2) (1977); A.B.A. Rules of Professional Conduct, Rule 1.1 (1983). Mr. Dempsey did not know enough about practice in federal court to effectively conduct the *Altamirano* trial. Proceedings in that trial were often interrupted while the trial judge tried to explain rules of procedure, constitutional law, the relationship between state and federal proceedings, and federal rules of evidence. Mr. Dempsey should have acquired such information before appearing in federal court. Such knowledge would be expected of any attorney of ordinary skill and learning who appeared before this court. Mr. Dempsey knew that he did not have sufficient knowledge or experience (AT 16, HT 9), and should have associated himself with, or obtained the advice of the public defender or other competent attorney.

Local Rule 110–3 requires every member of the bar of this court to "perform with the honesty, care, and decorum required for the fair and efficient administration of justice." Northern District of California Local Rules, Rule 110–3. The A.B.A. Code and Model Rules also require courteous and respectful conduct from attorneys appearing before the court. "In appearing in his professional capacity before a tribunal, a lawyer shall not: ... [e]ngage in undignified or discourteous conduct which is degrading to the tribunal." A.B.A. Code of Professional Responsibility, DR 7–106(C)(6); *see also* A.B.A. Model Rules of Professional Conduct, Rule 3.5(c). The comment to Model Rule 3.5 states in part: "Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants.... An advocate can present the cause, protect the record for subsequent review and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics." There is no place and no excuse for the type of disrespectful, sarcastic, and disruptive conduct engaged in by Mr. Dempsey during the *Altamirano* trial.

### B. *Appropriate Disciplinary Action*

In considering what disciplinary action is appropriate under the circumstances, the court was mindful of the six years that have passed since the *Altamirano* trial. It looked, therefore, for evidence that Mr. Dempsey's level of competence has improved or that he has modified his behavior. Unfortunately, that is not the case. Mr. Dempsey continues to perform at a substandard level, and he believes that his behavior throughout the *Altamirano* trial was appropriate.

1. *Failure to Recognize Inappropriateness of Conduct.*

This court attempted to ascertain whether Mr. Dempsey's conduct at the *Altamirano* trial was part of a pattern of behavior, or merely an aberration. Mr. Dempsey was asked in several ways whether he felt, in retrospect, that his conduct during the *Altamirano* trial was inappropriate. Mr. Dempsey's answers were not all responsive (HT 69–84), but those that were indicated that Mr. Dempsey does not understand his role as an officer of this court. In fact, he asserted in his motion for summary judgment that he was not an officer of the court. *See* Points and Authorities to Dismiss or for Summary Judgment, at 12. During the hearing, he suggested that a criminal attorney owes a duty *only* to his client (HT 78), and stated: "I could do what I wanted to do because I am an independent lawyer." (HT 41). Finally, after suggesting that the appellate court's opinion was "pretty dumb" (HT 80), Mr. Dempsey asserted that there was no merit to any of the citations of improper conduct (HT 83).

Until Mr. Dempsey understands what type of conduct is appropriate, he is bound to repeat his mistakes. In fact, his remarks and manner during the disbarment hearing were often inappropriate (HT *passim*), and he had to be reminded at least three times in a period of a few minutes not to interrupt the United States Attorney's opening remarks (HT 46, 50, 53–54). The need to constantly remind an attorney of the standard of appropriate professional conduct disrupts the flow of a court's proceedings. Moreover, Mr. Dempsey's misunderstanding of his responsibility to the court may lead to more serious breaches of ethics. Therefore, before Mr. Dempsey practices again before this court, he must satisfy the court that he understands his responsibility to act in a professional manner when appearing as an advocate before this court. To this end, he must successfully complete a course in Professional Responsibility. The court will accept as evidence of competence in this area, a passing score on any Multistate Professional Responsibility Exam given after the filing of this order, and acceptable responses to voir dire by this court on that subject.

2. *Continued Substandard Professional Performance.*

### The Disbarment Hearing

If Mr. Dempsey's advocacy during this proceeding is any indication of the type of

representation that he provides his clients, the public is in sore need of protection. Mr. Dempsey's presentation sometimes shifted from righteous indignation, to noble advocacy, to wounded sarcasm, to philosophical digression, all in response to the same question, and without provocation by the court (HT 35–42, 73–77). He often did not give logical responses to direct questions, and his remarks were often unrelated to the point being discussed (HT *passim* ). He did not read the transcript of the *Altamirano* trial in preparation for the hearing, and was unable to adequately address some of the charges for that reason (HT 30–31).

He moved for dismissal of the proceedings on the ground that the statute of limitations had passed. His argument, which erroneously argued that the statute of limitations for contempt applied, was meritless; and his moving papers were wholly inadequate. Mr. Dempsey was unable to present a coherent legal argument, but instead presented a series of barely relevant quotations, interspersed with irrelevant digressions and unsupported assertions.

Finally, Mr. Dempsey brought to this court's attention evidence that he has acted incompetently before other judges of this court. He submitted a transcript of a hearing he had before the Honorable Marilyn H. Patel (discussed below). He intended to show that other judges had not treated him fairly since the Ninth Circuit opinion was published. Instead, he managed to cast even greater doubt on his ability to successfully represent clients in federal court. The fact that Mr. Dempsey was unable to discern or appreciate the negative impact this evidence would have on this court's evaluation of his fitness to practice is cause for concern.

*The Hearing Before Judge Patel*

Mr. Dempsey represented his brother, Mr. James Dempsey, in a case against Pacific Bell Company, *Dempsey v. Pacific Bell Co.*, C–84–3150 MHP. Mr. Dempsey submitted to this court a transcript of a hearing on a motion for summary judg-

ment in that case held on February 4, 1985. That transcript ["PT"] reveals that Judge Patel dismissed Mr. Dempsey from that suit because of his incompetence (PT 7–10). Although the suit was based on a claim of wrongful discharge, Mr. Dempsey had not asked for production of his client's personnel file prior to the close of discovery (PT 6–7). Therefore, he was unable to support allegations that his client's evaluations had changed dramatically after he had refused to retire early. When informed of this omission, Mr. Dempsey insisted that discovery was not closed, and that he wanted the files produced in court (PT 7). Nevertheless, an examination of the files in that case reveals that the discovery cutoff date, February 2, 1985, had indeed passed.

The transcript also reveals that Judge Patel considered Mr. Dempsey's performance incompetent and his papers wholly inadequate (PT 8–9). After reading the file for that case, this court must concur. For example, although he failed to conduct adequate discovery to support his client's claim, Mr. Dempsey produced four sets of overlapping and overinclusive jury instructions. This obsession with jury instructions to the exclusion of other important pretrial matters is another example of the type of incompetent conduct from which the public should be protected. And, as in this case, Mr. Dempsey's legal arguments were difficult to decipher, and generally meritless or inadequate.

In order to remediate these failings, Mr. Dempsey must successfully complete professional courses in criminal and civil trial advocacy. He may apply for readmission to practice before this court when he is able to demonstrate competence in the basic skills of practice before this court, including a showing that he is able to: (1) present a coherent and organized legal argument; (2) understand and apply federal rules of civil procedure, criminal procedure, and evidence; and (3) adhere to local rules. *See Matter of Tranakos,* 639 F.2d 492, 493 (9th Cir.1981).

3. *Evidence of Erratic and Unstable Behavior*

Based on its observation of Mr. Dempsey during the disbarment hearing, and his behavior in other proceedings before this court, the court is concerned that the source of Mr. Dempsey's unprofessional and erratic behavior may have to do with his mental, physical or emotional health. The court noted Mr. Dempsey's inability to remain focused on the court's direct questions, and his everchanging attitude as he subjected the court to long, unfocused anecdotes and wide-ranging digressions. In addition to the inappropriateness of his remarks and responses, the court is concerned about evidence that Mr. Dempsey's grasp of reality is not as firm as it should be.

The court cannot ignore the pattern of unwarranted attacks on the professional integrity of this court. This pattern emerges in *United States v. Altamirano,* and continues in Mr. Dempsey's more recent appearances before this court. During the *Altamirano* trial, Mr. Dempsey accused the trial judge, the Honorable Cecil F. Poole (now a circuit judge), of illegal communication with the defendant (AT 600), and of trying to come between Mr. Dempsey and his client (AT 601). He also suggested that Judge Poole was preventing him from getting at the truth by citing him with contempt "every time [he got] near the facts" (AT 594–99).

*Dempsey v. Pacific Bell Co.* was originally assigned to the Honorable Eugene F. Lynch. When opposing counsel failed to appear for a hearing on a order to show cause, Judge Lynch chose to continue the hearing because he was not convinced that opposing counsel had been properly served. Disappointed that Judge Lynch had not imposed sanctions on opposing counsel, Mr. Dempsey wrote to the Judicial Conference of the United States accusing Judge Lynch of acting unfairly and without reason, and of illegal *ex parte* communication with opposing counsel. *See* Letter from Arthur D. Dempsey to Judicial Conference (June 15, 1984). Mr. Dempsey made no showing of *ex parte* contact between Judge Lynch and opposing counsel; and counsel for Pacific Bell, Ronald R. McClain, denied that such

contact had been made. He explained to the Judicial Conference that his failure to appear was based on his confusion, which was in turn due to the manner in which the moving papers had been served. *See* Letter from Ronald R. McClair to Judicial Conference (June 20, 1984). Shortly thereafter the case was reassigned to Judge Patel at Judge Lynch's request.

Mr. Dempsey's response to this court's decision to take judicial notice of the *Dempsey v. Pacific Bell Co.* file states: "In fact it became obvious as soon as the case was filed that the trial court was prejudiced against the client's case. Without going into it too deeply, ... it was clear that the court was in communication with opposing counsel outside the record, that counsel for Pacific Bell Company felt they could deny discovery and act illegally with impunity." Response to Court's Order to Allow Judicial Notice, at 2. "It became clear that an attempt was being made to breach the attorney-client relationship, and that the case was to be destroyed without trial." *Id.* This excerpt is only one of many similar representations made by Mr. Dempsey.

During the course of the disbarment hearing, Mr. Dempsey's feelings of persecution became more and more pronounced. He stated: "You know, when I come in here to defend a criminal, everybody is against me. Every man turns against me, you know. I'm always being ganged up on—right?" (HT 74). In one of his many attacks on the validity of the disbarment proceedings, he asserted:

There is a little bit of sour grapes in all this. Altamirano is about ready to get out. I thought he was going to be here. "We will give you parole if you [will] be here." I felt sure Altamirano was going to be here. I expected Solomon to be here. (HT 84).

When asked what he made of the fact that his cocounsel, Mr. Solomon, had not been charged with misconduct he replied, "I make of that that I am the fall guy." (HT 90). In his brief and at the hearing he

contended: "You know what the deal was. I will tell you what I think the deal was. I think that Solomon and Altamirano were saying in effect give us a deal, and we will get rid of Dempsey.... I was the club they were using." (HT 90–91).

A sample of the type of incoherent argument that was fairly typical of Mr. Dempsey's presentation occurred when this court attempted to ascertain the basis of Mr. Dempsey's assertion that Mr. Solomon should be disciplined, too:

> Mr. Dempsey: That's why I say Solomon should be charged, because he would be talking against himself if he came into this case.
>
> The Court: Wait a moment. Why do you say that your cocounsel should be charged?
>
> Mr. Dempsey: Because he approved it. That's the rules. He approved it. He had knowledge of it.
>
> The Court: He approved what?
>
> Mr. Dempsey: Whatever I did. He sat right there with me and conferred with me.
>
> The Court: That is your basis for saying he should be here, too?
>
> Mr. Dempsey: At least he shouldn't be here testifying against me.
>
> The Court: Did he do that?
>
> Mr. Dempsey: I don't know. That's why—It is not in the transcript. That's been my argument.
>
> The Court: Where do you get the idea that Mr. Solomon has testified against you or made charges against you?
>
> Mr. Dempsey: What if he did? I am coming in here—Mr. McTernan—
>
> The Court: You raised this issue—
>
> Mr. Dempsey: Surely.
>
> The Court (continuing): About Mr. Solomon. I am in good faith. To my knowledge, Mr. Solomon has not said anything against you or in favor of you. He is silent. He is not here. There are no affidavits of his. He is not included in the transcript.
>
> Mr. Dempsey: Wait a minute.
>
> The Court: His testimony is not included in the transcript. (HT 84–86).

Other examples of Mr. Dempsey's digressions, circular arguments, impertinent remarks, and general confusion appear throughout the transcript. This court declines to record each of them here. It merely notes that this is not the only, or the most, frustrating exchange that the court had with Mr. Dempsey during the short hearing. The transcript speaks for itself.

California's Rules of Professional Conduct state: "[T]he term 'ability' means a quality or state of having sufficient learning and skill and being mentally, emotionally, and physically able to perform legal services." Rules of Professional Conduct, Rule 6–101(C). While this court is not qualified to make a judgment about Mr. Dempsey's general competence or mental state, it finds that it is in the best interests of the public and of the legal profession for Mr. Dempsey to be examined and evaluated. *See In re M.*, 59 N.J. 304, 282 A.2d 37 (1971); *see also In re Chipley*, 254 S.C. 588, 176 S.E.2d 412 (1970), *cert. denied*, 400 U.S. 905, 91 S.Ct. 146, 27 L.Ed.2d 143 (1971). Therefore, before Mr. Dempsey is allowed to practice again before this court, he must undergo psychiatric and medical examinations to determine whether there is a psychiatric or medical problem associated with his conduct before this court. Should the examining psychiatrist or physician conclude that treatment is warranted, Mr. Dempsey must follow the recommended course of treatment as a precondition to readmission to practice before this court. His suspension will be lifted when he satisfies this court that he is psychiatrically and medically able, as well as professionally competent, to perform his professional duties.

## CONCLUSION

Mr. Arthur Daniel Dempsey is hereby suspended from the roll of attorneys qualified to practice before this court until such time as this court is satisfied that he is mentally, physically, and professionally

able to perform competently and to effectively represent his clients.

IT IS SO ORDERED.